*Terrance Belton v. State of Maryland*, No. 8, September Term, 2022. Opinion by Biran, J.

**CRIMINAL LAW – TRIAL – HARMLESS ERROR –** The Supreme Court of Maryland held that the State did not show beyond a reasonable doubt that the trial court's erroneous exclusion of the decedent's statement "This is my block" in no way influenced the jury's finding that Petitioner was guilty of voluntary manslaughter and use of a firearm in the commission of a crime of violence. The excluded statement was not merely cumulative evidence of the decedent's animus; instead, it went to the objective reasonableness of Petitioner's fear for his life.

**CONSTITUTIONAL LAW – DUE PROCESS – RIGHT TO FAIR AND IMPARTIAL JUDGES –** The Supreme Court held that the right to fair and impartial judges – both in fact and in appearance – extends to appellate proceedings. If the language of an appellate court's opinion could cause a reasonable person to question the participating judges' impartiality or otherwise suggests bias on the part of the court, then the party potentially injured by that partiality or bias has been deprived of due process, and the court has abused its discretion.

Circuit Court for Baltimore City
Case No. 119015009
Argued: October 4, 2022

IN THE SUPREME COURT

OF MARYLAND*

No. 8

September Term, 2022

_____

TERRANCE BELTON

v.

STATE OF MARYLAND

_____

Watts
Hotten
Booth
Biran
Gould
Eaves
Getty, Joseph M.
    (Senior Justice, Specially Assigned),

JJ.

_____

Opinion by Biran, J.
Booth, Gould, and Getty, JJ., concur.

_____

Filed: May 31, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

The Due Process Clause of the Fifth Amendment guarantees a criminal defendant the right to a fair trial, which requires that the members of the jury not be biased against the defendant. The fair trial right also includes the right to a trial judge who is impartial both in fact and in appearance.

Petitioner Terrance Belton[1] does not contend that the Baltimore City jury that found him guilty of voluntary manslaughter and related offenses was biased against him. Nor does he complain that the judge of the Circuit Court for Baltimore City who presided over his trial and who sentenced him was anything but impartial. Rather, he argues that the Appellate Court of Maryland (at the time, called the Court of Special Appeals of Maryland)[2] displayed bias against him in extensive dicta in its reported opinion affirming his convictions. Among other things, the Appellate Court in its opinion compared Belton – an African American man – to Grendel, the mythical monster in the Old English epic, *Beowulf*. Belton asserts that this analogy evokes racist tropes of African Americans as subhuman. He raises similar objections concerning several other passages in the Appellate Court's dicta.

Belton asks us to hold that the constitutional guarantee of a fair trial extends to appellate proceedings and further to hold that he did not receive due process on appeal.

---

[1] We have seen Belton's first name spelled both "Terrance" and "Terrence" in the record. Because Belton's counsel uses "Terrance" in her briefing, we do the same here.

[2] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

The State agrees that the right to a fair trial extends to appellate proceedings but argues that Belton's appeal did not suffer from any constitutional infirmity.

We agree with the parties that a criminal defendant's right to due process requires not only a fair and impartial trial, but also a fair and impartial appellate process. Because we conclude that the Appellate Court erred in deciding the merits of Belton's appeal and that a new trial is required, we shall not decide whether the Appellate Court's opinion violated Belton's right to due process. However, as we discuss below, this case reinforces the need for judges to use language that reflects the court's impartiality.

## I

## Background

### A. The Killing of Edward Calloway

On December 6, 2018, sometime after 7:00 a.m., Terrance Belton, 19, and his mother, Shakiea Worsley, 35, arrived at the corner of South Monroe Street and McHenry Street in Baltimore City. Worsley routinely sold drugs at that corner. Belton entered the grocery store on the corner of Monroe and McHenry Streets and exchanged pleasantries with "Nut,"[3] a friend of Edward Calloway. Calloway was another drug dealer who was active on that block.

The night before, Worsley had seen Calloway out on the block, drunk and agitated; according to Worsley, Calloway could be confrontational when he had been drinking. Worsley and Calloway had been "pretty cool in the beginning" of their time selling drugs

---

[3] Nut's first and last names are not contained in the record.

on the same block and had never argued about territory. Worsley and Calloway had had a few small arguments about other matters, but no physical altercations. Although a few others also worked that block, Worsley, Calloway, and Nut were the main regulars.

There was some history of mutual aid. Toward the end of August 2018, Worsley had been robbed at gunpoint in the alley on McHenry Street, but nobody on the block had been armed such that they could defend her. Calloway and Nut both bought handguns after that to protect those who were operating on the block. Calloway typically held the two guns, often storing one in the corner grocery store.

Belton did not know Calloway well. There was no history of arguments or fights between them. Belton knew that Worsley and Calloway had had small arguments in the past and that Calloway carried a gun. Belton had a .45 caliber handgun concealed on his person on the morning of December 6, 2018.

About 20 minutes after Worsley and Belton arrived at the corner of Monroe and McHenry Streets, Worsley moved her car closer to the corner, just as Calloway arrived in a friend's car. At approximately 7:45 a.m., Worsley and Belton exited their car and stood on the sidewalk, across the street from the car in which Calloway had arrived on the scene. Shortly thereafter, Calloway got out of the passenger seat of his friend's car and spoke to his associates gathered in the area. According to Belton, he heard Calloway tell those assembled as he pointed over the car: "This is my block." Moments later, Calloway began to head toward Worsley and Belton, holding a bag. Calloway was known to carry his handgun in such a bag. At that point, Worsley stepped ahead into the middle of the street to get between Calloway and Belton. Calloway passed by Worsley and came nearly face-

3

to-face with Belton. Calloway had his gun out as he asked Belton whether he "want[ed] some smoke" and asked why Belton had "come down here" to the block. Belton feared that if not handled, "the confrontation's only going to get bigger. It's going to [lead] to Mr. Calloway being – his ego's going to build, he's going to get more aggressive[.]"

So Belton attempted de-escalation. He suggested to Calloway that they might settle the score with a simple fistfight. Calloway gave his handgun to Nut and agreed to the fistfight. Still in possession of his own gun, Belton walked away up McHenry Street, taking his jacket off to prepare for the fight, while Worsley watched Calloway, who went into the corner store. Worsley feared that Calloway was getting another handgun from its storage space inside the store. She followed Calloway and saw him fumbling for something. She feared it was the unaccounted-for second handgun.

As Calloway was about to exit the store – and with Belton out of sight on McHenry Street – Worsley preemptively "started swinging" at Calloway in an attempt to prevent Calloway from "getting anywhere near [her] son." Their altercation spilled out in front of the grocery store. Calloway quickly gained the upper hand, knocking Worsley onto Monroe Street. After subduing Worsley, Calloway started walking quickly toward the corner of Monroe and McHenry Streets.

In the meantime, as Belton was walking up McHenry Street preparing for what he thought was going to be his own fistfight with Calloway, Nut called out to him that "they're fighting," which Belton understood to mean that Calloway was "physically assaulting" Worsley. Belton turned around and saw Nut holding the handgun he had taken from Calloway. Belton could not see Calloway and Worsley fighting – they were around the

4

corner from where Belton was – but he did see several men hastily backing up from the site of the fight. This suggested to Belton that Calloway had another gun, given Belton's belief that "a bunch of grown men" would not have been so scared by a run-of-the-mill fistfight.

Belton quickly walked back toward the corner of Monroe and McHenry Streets. He testified at trial that, as Calloway "pop[ped] around the corner," he saw Calloway lifting a small handgun out of his pants and approaching him quickly and aggressively, beyond the point of being reasoned with. Belton said he thought Calloway was going to shoot him. Belton then shot at Calloway until Calloway dropped his gun.

As Belton was shooting at him, Calloway turned and ran back around the corner toward where Worsley was still lying on the ground. Wounded by five gunshots, Calloway fell to the ground on top of Worsley. According to Worsley, Calloway said, "This bitch shot me." Belton then ran a short distance back up McHenry Street to where Worsley's car was parked. Worsley got out from under Calloway and hobbled to her car. Worsley then drove herself and Belton away from the scene. According to Belton, they left immediately, rather than stay on a block where the others present knew each other and might be hostile to him and Worsley, because:

> It's a block full of people that I don't know. It's a drug shop. Any one of these people could shoot me. I'm not going to stand around a bunch of people that know each other, congregate with each other, everyday [sic]. And I'm, like, the enemy, you know, I guess, at this point.

5

Calloway died from his wounds two days later. Belton was charged with murder and related offenses. Worsley was charged with being an accessory after the fact to Calloway's killing.

**B. The Trial**

Belton and Worsley were tried jointly in the Circuit Court for Baltimore City in January 2020. In her opening statement, Belton's attorney said the evidence would suggest that "if anyone is kind of in charge on that corner it's [Calloway]." The video footage and testimony, she said, would show that, on the morning of December 6, 2018, Calloway got out of his friend's car with "an attitude" and a bag with a gun in it. Defense counsel told the jury that Belton also had a gun that morning, and that he used it to shoot Calloway in defense of himself and Worsley.

In its case-in-chief, the State introduced footage of the shooting taken from surveillance cameras at Best Crabs, a business located across the street from where the shooting occurred.[4] The video footage appears to show the following beginning at approximately 7:45 a.m.: Calloway gets out of his friend's car, points over the car, then walks past Worsley and comes almost face-to-face with Belton. Moments later, Belton walks up McHenry Street, away from the grocery store, while Calloway appears to go into the grocery store. Very shortly after that, Calloway and Worsley begin fighting just outside

---

[4] In its opinion, the Appellate Court mistakenly referred to the corner grocery store in front of which Calloway and Worsley started fighting as Best Crabs. *Belton and Worsley v. State*, 253 Md. App. 403, 415, 417, 421, 444 (2021). Best Crabs is a different establishment. The two stores are located diagonally across the street from one another at the intersection of Monroe and McHenry Streets.

6

the grocery store, and the tussle moves toward the curb on Monroe Street. Calloway knocks Worsley off the curb just onto Monroe Street. Calloway then stumbles and is briefly on top of Worsley. Calloway then stands while Worsley remains on the ground. Calloway makes a movement with his right hand and then walks quickly on Monroe Street toward the corner of Monroe and McHenry Streets.

As Calloway is getting up off the ground and beginning to stride toward the corner of Monroe and McHenry, Belton is quickly moving down McHenry Street, approaching the same corner. Belton appears to come to a stop several feet short of the corner, with the exterior of the grocery store close to him on his right. Calloway takes a few more steps toward the corner and gets to the point where the two men seemingly can see each other. A moment later, Belton shoots at Calloway. As Belton begins firing at Calloway, Calloway turns around, runs back around the corner, and falls on top of Worsley.

The Best Crabs cameras were too far away from the location of the shooting to show definitively whether or not Calloway was holding a gun when Belton shot him. The State called as witnesses two of Calloway's associates who were at the corner of Monroe and McHenry Streets at the time of the shooting, and who testified that they did not see Calloway with a gun. The video footage showed that, after Calloway was shot, several people came up to Calloway and knelt near him during the approximately five minutes that elapsed before the first police officer arrived on the scene. Approximately 30 seconds after the shooting, as a man hunched over Calloway, that man seemingly handed something to another man, who then ran away from the scene down Monroe Street. Police did not recover any firearms at the scene.

Belton testified in his defense case. On direct examination, when Belton stated that Calloway had said, "This is my block" to his associates after getting out of his friend's car, the State objected and a bench conference ensued. Belton's attorney explained that the defense was offering the statement not to show that the block at the intersection of Monroe and McHenry Streets belonged to Calloway, but rather "to show what [Calloway's] demeanor was," the effect of Calloway's statement on [Belton], and "that, when [Calloway] got out of the car, he was already having attitude." The trial judge sustained the State's objection and excluded the statement as hearsay. As noted above, with respect to the confrontation immediately before the shooting, Belton testified that he saw Calloway lifting a small gun out of his pants as Calloway approached him aggressively.

The trial court instructed the jury on both self-defense and defense-of-others without objection from the State. Although Belton's counsel in her opening statement had mentioned the defense of Worsley (as well as self-defense) in previewing the grounds that Belton would offer as justification for the shooting, in her closing argument she contended only that Belton shot Calloway in self-defense. On that point, Belton's attorney directed the jury to the video footage, which she said showed that, after subduing Worsley, Calloway made a "beeline" for the corner of Monroe and McHenry Streets, at the same time that Belton was on McHenry Street, coming back to the intersection with Monroe Street. According to Belton's attorney, the video showed that Calloway was "not going to anybody else but [Belton]. And as he's doing it, … you can see his arm. You can see him get something, put it in his hand and go towards the corner."

8

The State contested the existence of the second gun but agreed as to its importance: "There's a singular issue in this case. It's a singular factual issue that you have heard two competing theories on," the prosecutor said in his rebuttal argument. "There was no gun, or if you were to believe … Mr. Belton's account that the victim had a gun on him and was intending to use it, that is the singular factual issue that is in dispute here."[5] Later in his rebuttal, the prosecutor observed that the determination of whether Belton had acted in self-defense was "not an easy call."

The jury found Belton not guilty of second-degree murder. Finding that imperfect self-defense applied (meaning that Belton actually feared for his life but his fear was not objectively reasonable), the jury found him guilty of: (1) voluntary manslaughter, in violation of Md. Code Ann., Crim. Law (CR) § 2-207 (2002, 2012 Repl. Vol., 2018 Supp.); (2) use of a firearm in the commission of a crime of violence, in violation of CR § 4-204; and (3) wearing/carrying a concealed handgun on his person, in violation of CR § 4-203. The jury found Worsley guilty of being an accessory after the fact to manslaughter. The trial court subsequently sentenced Belton to a total of 23 years of incarceration on his three counts of conviction, with all but 13 years suspended. The court sentenced Worsley to five years of imprisonment, with all but two years suspended, and three years of supervised probation. Belton and Worsley appealed their convictions.

---

[5] The trial judge agreed that the case turned on whether Calloway had been holding a gun at the time Belton shot him: "I mean, I, candidly, would be surprised if they do not have a verdict in this case by 5 o'clock. I mean there's not much of a factual discrepancy. It's basically what's in [Calloway's] hand."

### C. The Appellate Court's Opinion

Belton's and Worsley's appeals were consolidated. Belton contested the trial court's exclusion of Calloway's statement ("This is my block") as hearsay, arguing that it was admissible evidence relevant to the objective reasonableness of his fear of imminent death or bodily harm. Worsley argued on appeal that, because Calloway died after her alleged acts as an accessory, the evidence was insufficient to convict her of being an accessory after the fact to manslaughter.

The Appellate Court of Maryland submitted the case on the briefs on June 18, 2021. On December 28, 2021, the Appellate Court issued a reported opinion affirming Belton's and Worsley's convictions. *Belton and Worsley v. State*, 253 Md. App. 403 (2021). The court agreed with Belton that it was error to exclude Calloway's "angry comment, 'This is my block,'" because the statement was not hearsay and it was relevant to Belton's theory of self-defense. *Id.* at 417, 434-35, 451-53. However, the court concluded that the error was harmless beyond a reasonable doubt, as this statement by Calloway was just one of many pieces of evidence of Calloway's animus toward Belton and Worsley. *Id.* The Appellate Court held that Worsley had failed to preserve her claim of error for appellate review, and declined to notice any plain error. *Id.* at 456.[6]

---

[6] Worsley did not seek further review of the Appellate Court's affirmance of her conviction.

10

Rather than refer to Belton and Worsley by their names throughout the opinion, the court defined terms for them: "Son" and "Mother," respectively. *Id.* at 409.[7] At the outset of the opinion, the court framed "the Son's" claim of error as follows:

> In this case, the out-of-court declarant was Edward Calloway, the ultimate manslaughter victim, now dead. He was speaking to several of his friends and associates as the Son, the auditor of the assertion, approached to within hearing distance. The Son testified that Calloway spoke the words, "This is my block." The State objected on the ground that the words were hearsay. After some wrangling at the bench, the State's objection was sustained. Both the State and the Son now agree that the assertion, "This is my block," was not offered to prove the truth of the thing asserted, to wit, that Calloway enjoyed an entrepreneurial monopoly over the selling of drugs sold in the Monroe-McHenry open-air market. That, of course, is the last thing in the world that the Mother and Son, as entrepreneurial rivals of Calloway, would have wished to prove.

*Id.* at 410.

The Appellate Court's resolution of Belton's and Worsley's claims of error takes up approximately five pages in the bound volume of reported opinions. *See id.* at 451-56. The bulk of the opinion (approximately 40 pages) is dicta concerning the application of the doctrines of defense-of-others and self-defense to Belton's and Worsley's trial. The parties did not brief these points. The Appellate Court raised them *sua sponte* after the case was submitted on the briefs.

The first paragraph of the Appellate Court's opinion, in full, reads as follows:

> In the Old English epic of <u>Beowulf</u>, the peace and tranquility of Hrothgar's Hall was initially shattered by the unexpected appearance of the monster Grendel. It was, even more direly, terrorized by the subsequent arrival of Grendel's Mother. In the case now before us, the peace and tranquility of South Monroe Street at McHenry Street was ruptured on

---

[7] "Belton" appears seven times in the text of the opinion, whereas "Son" appears 158 times; "Worsley" appears eight times, whereas "Mother" appears 100 times.

11

December 6 of 2018 by the simultaneous appearances of both the son, Terrence Belton, and the mother, Shakiea Worsley. Literary scholars tell us that Hrothgar's Hall was situated in Geatland in what is now the southwestern corner of modern-day Sweden. Police experts tell us that the intersection of South Monroe Street and McHenry Street is an open-air drug market in what is now the southwestern corner of Baltimore City.

*Id.* at 408-09.

In a section of the opinion titled "Demythologizing 'Mother,'" the court speculated that Belton's acquittal on the murder charge was attributable to the jury's sympathy for Worsley as Belton's mother. *Id.* at 411. Because a defense based on the need to protect one's mother from the imminent and immediate threat of death "packs a heavy emotional punch," the court provided an "admonitory caveat":

> Before an appropriately neutral analysis of the hard facts could even begin to emerge, there was a potentially distracting ambience hovering over the trial that had to be dissipated. The intersection of South Monroe Street and McHenry Street was not the Hallmark Hall of Fame. The appellant Belton, however, cast his very presence at that crime scene as the fulfilment of his filial duty to protect his mother in a potentially dangerous and violent environment. That was why he was there. He defended his ultimate shooting of Edward Calloway as necessitated by his defense of others, to wit, his Mother, from the imminent threat of death or serious bodily harm. Those, of course, are exemplary qualities, calculated to engender a sense of juror sympathy.

*Id.* The court opined that the jury's "dubious guilty verdict of mitigated voluntary manslaughter rather than of unmitigated second-degree murder may almost certainly be attributed to such sympathies in the minds of the jurors." *Id.*

The next several paragraphs represented the court's effort to "remove the sentimental stereotype" that the court believed Belton had attempted to draw upon in claiming (at first) that he had killed Calloway in defense of Worsley. *Id.* at 412. According

to the court, it was necessary to "forgo any temptation to think of … Worsley as Whistler's

Mother, calling out from her decrepitude for protection from the slings and arrows of the

Monroe-McHenry open-air drug market." *Id.* (footnote omitted).[8] Rather, the court

explained, Worsley was

> a young and vigorous 35-year-old. Two years earlier, she had lost her license to practice as a nursing assistant because of her conviction in the District Court for the unlawful possession of narcotic drugs. She received a suspended sentence. It was then that she turned to selling drugs for a living, heroin and crack cocaine. To put her age in generational perspective, she lived with, and was charged with taking care of, her own grandmother, who was suffering from Alzheimer's disease. We must remember, therefore, that the appellant Worsley in this case was not the grandmother in that household but the granddaughter. In terms of physical prowess, moreover, the appellant Worsley was not the fragile victim of a physical assault, but was unquestionably the initial aggressor … who actually precipitated the fistfight with her rival drug dealer that turned into the catalyst for the ultimate killing.

*Id.*

Concluding the "Demythologizing 'Mother'" section of the opinion, the court

observed:

> It finally behooves us to remember that far from being imperiled by slings and arrows, the Mother was herself the source of many of the slings and arrows that randomly pervaded the Monroe-McHenry open-air drug market. She had been a regular drug peddler of heroin and crack cocaine there on a daily (actually a nightly) basis for over two years. She held her own in that largely male-dominated criminal venue for all of those two years.
>
> In making our mental appraisal of the cold hard facts, therefore, we must scrupulously avoid looking at the scene through the sentimentally distorting lens of James Abbott McNeill Whistler or of Norman Rockwell or

---

[8] The opinion cited James Whistler, "Arrangement in Grey and Black No. 1," an 1871 painting popularly known as "Whistler's Mother." This is a portrait of the artist's mother, Anna Matilda McNeil Whistler, created when she was 67 years old. Peter Schjeldahl, *Mom's Home: The mysteries of "Whistler's Mother"*, The New Yorker (Aug. 31, 2015), available at https://perma.cc/S88V-K7LG.

of Currier and Ives. We must appraise the legal status of the two co-appellants essentially as if they were unrelated. The Son may have been in league with his Mother but he was not protecting a helpless Old Lady from harm. It was not Whistler's Mother selling drugs on South Monroe Street.

*Id.* at 413.

Later in the opinion, in describing how Worsley began fighting Calloway, the court stated that Belton was "summoned back with the unexpected news that the fight had started without him, his Mother taking his place on the fight card." *Id.* at 418. The court referred several times to Belton and Worsley as the "Mother-Son combat unit." *Id.* at 442. In discussing Belton's trial testimony concerning his and Worsley's decision not to leave the scene after Calloway first displayed "hostile animus" toward them, the court characterized Belton as "Byzantinely nuanced in his response" and described Belton's reasoning as "truly geopolitical in terms of positioning themselves for future advantage in a potentially violent and competitive marketplace." *Id.* at 445.

The bottom line of the court's dicta was that the jury should not have been instructed on self-defense. *See id.* at 449.[9] However, the court acknowledged that the verdicts established that the jury had considered both imperfect and perfect self-defense, and the combination of verdicts (not guilty of second-degree murder but guilty of manslaughter) was "beyond [the court's] power to overturn." *Id*. at 451.

On January 6, 2022, Belton filed a motion in the Appellate Court to recall and reconsider the court's opinion. Belton argued that "[t]he reported opinion … lacks the

---

[9] We discuss the factual premises underlying the Appellate Court's dicta in Part IV below.

14

appearance of impartiality by employing inappropriate and racially-charged comparisons and by degrading the appellants, the victim, and their community." He contended that "[t]he problematic tone and language of the opinion," among other things, violated his right to fair and impartial judges and his right to the appearance of fair and impartial judges. Belton asserted that the "flawed portions of the opinion are wholly separate from the discussion of the merits of the issues raised in the appeals and excising these portions would not affect the holdings or mandate of the opinions."[10] The State filed a response in which it took no position on Belton's motion. On March 4, 2022, the Appellate Court denied Belton's motion to recall and reconsider the opinion.

Belton then filed a petition for writ of *certiorari*, which this Court granted on May 9, 2022. *Belton v. State*, 478 Md. 511 (2022). Belton presents four questions for our review, which we have reordered and rephrased as follows:

1. Was the trial court's exclusion of Belton's testimony regarding Calloway's statement, "This is my block," harmless error?

2. Does a criminal defendant's right to a fair and impartial judge and the appearance of a fair and impartial judge extend to appellate proceedings?

3. Does the language of the Appellate Court of Maryland's opinion demonstrate that Belton was deprived of a fair appellate proceeding?

4. Did the Appellate Court of Maryland err in denying Belton's Motion to Recall and Reconsider Reported Opinion?[11]

---

[10] Worsley joined in Belton's requested relief.

[11] In his petition, Belton sought review of the following questions:

## II

## Standard of Review

When an appellate court considers the State's argument that an error is harmless, the court conducts "its own independent review of the record." *Dorsey v. State*, 276 Md. 638, 659 (1976). The State bears the burden to show that the error is harmless beyond a reasonable doubt. *See Dionas v. State*, 436 Md. 97, 108 (2013). We review questions of law and constitutional claims *de novo*. *Smith v. State*, 481 Md. 368, 390 (2022).

---

1. As a matter of first impression, does a criminal defendant's right to a fair and impartial judge and the appearance of a fair and impartial judge extend to appellate proceedings?

2. Does the intermediate appellate court's reported opinion, containing racially-charged comparisons, analogies of the appellants to literary monsters, disparagement of the Baltimore City community in which the events underlying the case took place, and a lengthy explanation of why petitioner's mother, a co-appellant, was not entitled to be viewed with the compassion generally afforded to mothers, all in dicta unnecessary to the Court's holding violate petitioner's right to fair and impartial judges and the appearance of fair and impartial judges?

3. Did the Court of Special Appeals err in denying petitioner's Motion to Recall and Reconsider Reported Opinion where the opinion denies petitioner's right to fair and impartial judges and the appearance of fair and impartial judges?

4. Did the intermediate appellate court err in holding that the trial court's erroneous exclusion of petitioner's testimony regarding the victim's statement, "This is my block" which was critical to petitioner's self-defense and defense-of-others defenses, constituted harmless error?

# III

## Harmless Error

The State acknowledges that the trial court erred in excluding Calloway's statement, "This is my block," as hearsay. The statement was not offered to prove that the block in question was Calloway's, but rather for its effect on Belton. And the excluded statement was plainly relevant to Belton's claim of self-defense. However, the State contends that the erroneous exclusion of this statement was harmless beyond a reasonable doubt because it was cumulative of other evidence that was admitted which showed Calloway's animus toward Belton. In contrast, Belton argues that "This is my block" was different in kind from the other evidence before the jury and that, if the jury had been permitted to consider it, it is possible the jury would have found that Belton acted in perfect, not just imperfect, self-defense. We agree with Belton.

This Court recently reaffirmed Maryland's longstanding harmless-beyond-a-reasonable-doubt standard for harmless error review. *Gross v. State*, 481 Md. 233, 253-54 (2022); *see also Dionas*, 436 Md. at 108 (describing the test as "well established, and relatively stringent"). As this Court first explained the standard in *Dorsey v. State*,

> when an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed 'harmless' and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of – whether erroneously admitted or excluded – may have contributed to the rendition of the guilty verdict.

*Dorsey*, 276 Md. at 659. "To say that an error did not contribute to the verdict is … to find that error unimportant in relation to everything else the jury considered on the issue in

17

question, as revealed by the record." *Bellamy v. State*, 403 Md. 308, 332-33 (2008) (internal quotation marks and citations omitted).

The State bears the burden to exclude beyond a reasonable doubt the possibility that the error affected the jury's decisional process. *See Hunter v. State*, 397 Md. 580, 596 (2007); *see also Denicolis v. State*, 378 Md. 646, 658-59 (2003) (explaining that, in order for the State to show that an error was harmless beyond a reasonable doubt, the record must affirmatively show that the error was not prejudicial). For these reasons, this Court has stated that harmless error review "is the standard of review most favorable to the defendant short of an automatic reversal." *Bellamy*, 403 Md. at 333. "It is an unusual occasion where the erroneous exclusion of evidence contradicting material elements of the State's theory of the crime will be found to be harmless error." *Id.*

The jury's perspective is the proper focus of harmless error review; therefore, in conducting such a review, an appellate court must not encroach upon the jury's judgment. *See Dionas*, 436 Md. at 118. The reviewing court does not find facts or weigh evidence. *Id.* at 109.

This Court recently reaffirmed the importance of cumulativeness in determining whether an evidentiary error is harmless. *See Gross*, 481 Md. at 260-61. In *Gross*, we held that the erroneous admission of hearsay video evidence was harmless beyond a reasonable doubt because the substance of the statements in the video footage was "materially indistinguishable from the evidence the jury heard from other sources" not challenged by the petitioner. *See id*. at 266-67.

Cumulativeness is at issue here. The State contends that Calloway's "This is my block" statement is cumulative evidence of Calloway's animus toward Belton and Worsley, pointing to a number of other indicators that Calloway was hostile to Belton and Worsley that day, all of which were before the jury:

> (1) Calloway and Worsley were drug dealers in the same area and had had arguments in the past, including one on the night before the shooting;
>
> (2) the night before the shooting, Calloway appeared to Worsley to be more agitated than usual;
>
> (3) when Calloway returned to the block, he walked toward Belton and engaged in verbal aggression, asking Belton if he "want[ed] some smoke";
>
> (4) Calloway was openly carrying – and perhaps had even pulled – his gun at the time he asked Belton if he "want[ed] some smoke";
>
> (5) Calloway agreed to have a fistfight with Belton; and
>
> (6) Calloway and Worsley actually fought in the street.

Considering these properly admitted pieces of evidence speaking to Calloway's animus and aggression, the State argues that "This is my block" is cumulative and therefore its exclusion was harmless. The intermediate appellate court agreed; because the jury was aware of all of this evidence of animus, the court concluded that "[o]ne additional hostile remark ["This is my block"] would have been so relatively negligible as to have been absolutely nugatory." *Belton and Worsley*, 253 Md. App. at 453.

But Belton did not offer Calloway's "This is my block" statement only to show that Calloway was hostile toward him and Worsley. Rather, Belton argued to the trial court that this statement was relevant to show that, as Calloway was getting out of his friend's car,

19

Calloway "was already having attitude." Defense counsel further argued that the statement "goes to the effect on [Belton]." Regarding that effect, Belton contends that "This is my block" uniquely sheds light on the objective reasonableness of his fear of death or bodily harm when he came face-to-face with Calloway after the fight between Calloway and Worsley.

Objective reasonableness is judged based on the subjective factual understandings of the defendant, so long as a reasonable person in the defendant's position could also have perceived the facts or circumstances in that way. *See State v. Marr*, 362 Md. 467, 480-81 (2001) ("A belief, as to either imminent danger or the amount of force necessary to meet that danger, is necessarily founded upon the defendant's sensory and ideational perception of the situation that he or she confronts."). Those understandings are often shaded by knowledge or perceptions of ancillary or antecedent events. *Id.* at 481.

In this case, an assessment of objective reasonableness involves consideration of more than Calloway being hostile toward Belton and Worsley. It also includes: (1) that Calloway was more aggressive and territorial than normal that day; and (2) that he had announced his dominance to those present that day. Both of these considerations speak to the objective reasonableness of Belton's fear, because they might persuade a reasonable person that Calloway would escalate the encounter toward deadly violence. Calloway's "This is my block" comment, unlike the six pieces of evidence upon which the State relies, was relevant to establish these two factors.

First, Calloway's statement may have established him as more territorial than normal, indicating a higher objective risk that he would use the firearm that Belton testified

20

Calloway was lifting from his pants as Calloway popped around the corner. There was little history of territorial competition at Monroe and McHenry Streets. Indeed, Calloway and Worsley had coexisted on the block without violence or arguments about territory for many months (albeit with some non-physical arguments about other matters), and Worsley's testimony about the origin of the block's two handguns shows a degree of mutual aid. "This is my block" is the only evidence that reveals Calloway's inward sense of territoriality and shows a public declaration that could make it more difficult for Calloway to de-escalate any claim of dominance without losing face. Overhearing "This is my block" may have heightened both Belton's subjective sense of Calloway's territoriality and a reasonable person's objective sense of Calloway's unusually possessive and potentially violent intent that day.

It is possible to read Calloway's questions to Belton ("Why did you come down here?" and "Do you want some smoke?") as bearing a similar degree of territoriality to "This is my block," a reading that might make the earlier "This is my block" announcement merely cumulative. But "This is my block" was a public declaration, and this feature distinguishes it from the direct-to-Belton "Why did you come down here?" A jury might have found it objectively reasonable to see "Why did you come down here?" as an individualized escalation that built upon "This is my block," rather than as an independent source of the same understanding.

Second, if the jury had been permitted to consider the "This is my block" statement, it might have found that Belton reasonably understood himself to be surrounded by hostile elements. In the moments leading up to the shooting, Belton knew that Nut was armed and

21

that Calloway had just asserted his dominance to his associates on the block. Belton expressed fear at "a block full of people that [he did not] know" but who knew each other and any of whom could shoot him. A jury considering Calloway's "This is my block" declaration might have found this belief objectively reasonable.

Based on Belton's arguments about the evidentiary value of "This is my block" and its potential influence on the jury's objective reasonableness finding, we conclude that the State has failed to show beyond a reasonable doubt that the erroneous exclusion of Calloway's statement in no way influenced the verdict. Its exclusion was harmful, reversible error. Accordingly, we shall reverse the judgment of the Appellate Court with respect to Belton's convictions for manslaughter and use of a firearm in the commission of a crime of violence and order a new trial for Belton on those charges.[12]

## IV

### The Appellate Court's Opinion

Belton argues that the intermediate appellate court violated his right to due process because the language of the opinion evinces racial bias or the appearance of racial bias. He asks this Court to vacate the reported opinion or to order the Appellate Court to recall it. The State agrees that the right to due process includes the right to fair and impartial judges

---

[12] In his briefing, Belton asks this Court to "reverse [his] conviction for voluntary manslaughter and use of a handgun in the commission of a crime of violence and remand for a new trial." He has not sought reversal of his conviction for carrying a concealed handgun on his person, in violation of § 4-203 of the Criminal Law Article. Belton admitted at trial that he brought a gun with him to the corner of Monroe and McHenry Streets. He offered no defense at trial to the CR § 4-203 charge. Accordingly, we shall affirm the Appellate Court's judgment regarding Belton's conviction for carrying a concealed handgun.

22

on appeal, but argues that Belton has not shown that he was deprived of due process based on the language of the Appellate Court's opinion.

We agree with the parties that the right to fair and impartial judges – both in fact and in appearance – extends to appellate proceedings. *See Jackson v. State*, 364 Md. 192, 207 (2001) (holding that the sentencing judge violated the defendant's right to a fair and impartial judge by appearing to impermissibly consider race as a factor in sentencing; the judge's comments could cause a reasonable person to question the judge's impartiality); *Archer v. State*, 383 Md. 329, 356 (2004) (extending the *Jackson* impartiality standard beyond sentencing, and finding a due process violation where the court made comments showing a sustained effort to force a State's witness to testify); U.S. Const., amend. VI; U.S. Const., amend. XIV; Md. Decl. Rts., Art. 21. If the language of an appellate court's opinion could cause a reasonable person to question the participating judges' impartiality or otherwise suggests bias on the part of the court, then the party potentially injured by that partiality or bias has been deprived of due process, and the court has abused its discretion. *See Jackson*, 364 Md. at 207; *Archer*, 383 Md. at 357.

Because we have concluded that the Appellate Court erred with respect to the determination of harmless error and that Belton is entitled to a new trial, we shall not decide whether the Appellate Court deprived Belton of due process or otherwise abused its discretion through its choice of language in its opinion. However, given the unique circumstances present here, the concept of discretion in an appellate court's choice of language merits additional reflection and guidance.

In the past, this Court has described judicial discretion as

a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. Where the decision or order is a matter of discretion it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.

*Stabb v. State*, 423 Md. 454, 465 (2011). Courts often focus on discretion as power or decisional autonomy, leaving multiple courses of action open under the law. George P. Fletcher, *Some Unwise Reflections about Discretion*, Symposium, *Discretion in Law Enforcement*, 47 LAW & CONTEMP. PROBS., no. 4, at 269, 270 (1984). When judges, especially appellate judges, exercise this power to choose, they perform a quintessential judicial function: deciding hard cases so as to serve equal justice, remain faithful to the law, and grapple humbly and impartially with gaps in the law while eschewing "pretensions of certainty." *See* Harry T. Edwards, *The Role of a Judge in Modern Society: Some Reflections on Current Practice in Federal Appellate Adjudication*, 32 CLEV. ST. L. REV. 385, 395, 397 (1984) (quoting BENJAMIN CARDOZO, THE NATURE OF THE JUDICIAL PROCESS 113-14 (1921)).

Before addressing the Appellate Court's exercise of discretion in this case, we emphasize three important points. First, appellate judges have very broad discretion to write the opinions in their cases as they see fit. We expect that only in the most extraordinary of circumstances will an opinion of the Appellate Court (or for that matter,

this Court[13]) be found to have violated an appellant's right to due process in a criminal case.

Second, we are certain that the author of the opinion, the Honorable Charles E. Moylan, Jr., the two other judges on the panel, and the other judges of the Appellate Court who voted to report the opinion did not intend to decide Belton's case (and Worsley's case) based on any impermissible considerations, including race. Nothing in this opinion should be construed as impugning the character of the author of the opinion or of any other judge of the Appellate Court.

Third, Judge Moylan for many years has justifiably been regarded in Maryland and beyond as one of the finest writers of appellate opinions. Judge Moylan is worthy of our respect and gratitude for his contributions to Maryland jurisprudence and the Maryland Judiciary over many decades, and he has it.

With these points in our minds, we must express our concerns about the Appellate Court's exercise of discretion in choosing the language of its opinion in this case. Separate and apart from a constitutional analysis, we highlight two problems: (1) literary analogies and other comparisons that could be interpreted as evoking racial stereotypes or suggesting that they are the product of implicit bias[14]; and (2) the opinion's overall tone.

---

[13] In holding that due process requires appellate judges to be fair and impartial in fact and in appearance, we recognize that this Court must live up to that standard, and that an aggrieved criminal litigant may seek review in the United States Supreme Court if we fail to do so.

[14] The term "implicit bias" denotes that "behavior is largely influenced by [] unconscious associations and judgments … that our conscious brain is not capable of processing." Anthony G. Greenwald and Mahzarin R. Banaji, *Implicit social cognition:*

25

*The Opinion's <u>Beowulf</u> Analogy and Other Comparisons*

In his translation of *Beowulf*, Howell D. Chickering refers to Grendel, among other things, as an "unholy spirit," a "dark death shadow," an "evil monster," a "dark walker," and a "demon." BEOWULF 55, 59, 89 (Howell D. Chickering trans., Anchor Books 2006). One scholar has described Grendel as "a creature of darkness, exiled from happiness and accursed of God, the destroyer and devourer of our human kind," a monster who consumes the men he kills "now that he could hope to eat his fill." GWYN JONES, KINGS, BEASTS AND HEROES 12-13 (1972). Another wrote that "Grendel the monster is identified as a Christian devil, one of the progeny of Satan cast out of heaven." FRANK CAWSON, THE MONSTERS IN THE MIND: THE FACE OF EVIL IN MYTH, LITERATURE, AND CONTEMPORARY LIFE 38 (1995).

The Appellate Court's *Beowulf* reference is brief and appears at the beginning of the opinion. *Belton and Worsley*, 253 Md. App. at 408-09. We assume that the author included it at the outset of the opinion in an attempt to win the reader's interest and enliven the text with a literary allusion, rather than to characterize Belton and Worsley as monsters for

---

*Attitudes, self-esteem, and stereotypes*, PSYCHOLOGICAL REVIEW, Vol 102(1), Jan 1995, 4-27. A growing body of law and social science literature explores this idea in the context of judicial determinations. *See, e.g.*, Jerry Kang, *What Judges Can Do About Implicit Bias* (May 1, 2021), 57 Ct. Rev. 78 (2021), available at SSRN: https://perma.cc/3G3K-J8VB; Catie Wheatley, *Honesty is the Best Policy: Addressing Implicit Bias in the Judiciary*, 9 IND. J.L. & SOC. EQUAL. 94 (2021) 94-96, 114 (reasoning that "whether judicial bias exists is a simple syllogism: all people have implicit biases, judges are people, therefore judges have implicit biases" but also concluding that "judges are human. And humans are capable of change.") (footnotes omitted); Jeffrey J. Rachlinksi et al., *Does Unconscious Racial Bias Affect Trial Judges?*, 84 NOTRE DAME L. REV. 1195, 1225 (2009) (reporting results of study of implicit bias in judges which included findings that "implicit biases are widespread among judges").

argumentative purposes. Regardless of the author's intent in drawing the analogy to *Beowulf*, comparing criminal defendants to monsters is inappropriate, particularly when doing so might perpetuate racist stereotypes of African American people as violent and sub-human. *See* CalvinJohn Smiley & David Fakunle, *From "brute" to "thug:" The demonization and criminalization of unarmed Black male victims in America*, J. HUM. BEHAV. SOC. ENV'T 350, 352-54 (2016) (analyzing use throughout American history of tropes and language that portray African American men as brutes and thugs, including one newspaper's description of a lynching victim as "a monster in human form"); Ann Cammett, *Deadbeat Dads & Welfare Queens: How Metaphor Shapes Poverty Law*, 34 B.C. J. LAW & SOC. JUST. 233 (2014) (discussing the influence of "racialized metaphors" "on the way people unconsciously perceive reality").

The caselaw speaking to this proposition generally involves the more emotionally fraught context of a prosecutor using racially charged analogies in summation before a jury. *See, e.g.*, *Lawson v. State*, 389 Md. 570, 596-98 (2005) (prosecutor's implication that the defendant was a monster was "inappropriate" and directly affected the defendant's right to a fair trial; "The right to a fair trial and the search for the truth … should not be hampered or obfuscated by extreme appeals to passion calculated to inflame the jury."). Although cases like *Lawson* involve improper "appeal[s] to the prejudices of the jury," *id.* at 597, judges – just like prosecutors – must "maintain an air of dignity and stay above the fray." *Walker v. State*, 121 Md. App. 364, 381 (1998).

Judges must vigilantly guard both their actual impartiality and their appearance of impartiality. In the appellate context, this requires careful contemplation of how the

language of our opinions may be taken, including how this country's tortured racial history may make otherwise benign literary and artistic references land on modern ears.

In this regard, the "Demythologizing 'Mother'" section of the opinion also warrants comment. The opinion contrasted Worsley (a "young and vigorous 35-year-old") with the more elderly Whistler's Mother. *Belton and Worsley*, 253 Md. App. at 412. To put Worsley's age "in generational perspective," the court noted that Worsley was the caretaker for her grandmother. *Id.* The court advised the reader to "scrupulously avoid looking at the scene through the sentimentally distorting lens of James Abbott McNeil Whistler or of Norman Rockwell or Currier and Ives." *Id.* at 412-13. The court continued: "The Son may have been in league with his Mother but he was not protecting a helpless Old Lady from harm. It was not Whistler's Mother selling drugs on South Monroe Street." *Id.* at 413.

These comparisons call to mind narratives about African American women as angry and less than virtuous,[15] thereby suggesting that Worsley did not deserve the sympathy that

---

[15] *See, e.g.*, Kelly Yu-Hsin Liao, Meifen Wei, Mengxi Yin, *The Misunderstood Schema of the Strong Black Woman: Exploring Its Mental Health Consequences and Coping Responses Among African American Women*, PSYCHOLOGY OF WOMEN QUARTERLY (Oct. 29, 2019) (describing the idea of the "strong black woman" as an instance of gendered racism offered as an alternative to other negative stereotypes, including "the domineering Sapphire; the hypersexual Jezebel; the nurturing, asexual Mammy for European American families; and the dependent Welfare Queen"); Dorothy E. Roberts, *Punishing Drug Addicts Who Have Babies: Women of Color, Equality, and the Right of Privacy*, 104 HARV. L. REV. 1419, 1436-44 (1991) (Since "the original exploitation of Black women during slavery," "Black women have fallen outside the scope of the American ideal of womanhood"); Cammett, *supra*, at 237, 251 ("[T]he social construction of poor Black single mothers deemed them the agents of their own misfortune due to their unmarried status – assumed to indicate loose morals, hypersexuality, and presumed laziness – framed as reliance on public assistance rather than work" and discussing the "legacy of stereotypes dating back to the antebellum era, which cast [Black women] as innately immoral").

might naturally be extended to the more elderly White mothers and grandmothers depicted by Whistler, Rockwell, and Currier & Ives. We do not perceive any active intent to invoke these characterizations, but the effect remains powerful regardless.

Finally, the opinion stated that "[t]he intersection of South Monroe Street and McHenry Street was not the Hallmark Hall of Fame." *Belton and Worsley*, 253 Md. App. at 411. This reference could be read as drawing a racialized contrast between the African American neighborhood where the events of this case took place and the mostly White settings traditionally depicted in Hallmark Hall of Fame programs.[16]

We recognize that some readers of the Appellate Court's opinion might see only what we believe the author intended by alluding to *Beowulf*, Whistler's Mother, and the Hallmark Hall of Fame: the use of literary devices to facilitate reader engagement. However, other readers of the opinion could question whether these comparisons reflect implicit bias. This concerns us greatly. At all times, we must strive to ensure that the language we use reflects our impartiality as judges. This requires us to read our work with a critical eye before we publish it and to do our best to avoid using language that plausibly could be read to suggest the presence of bias.[17]

---

[16] The Hallmark Channel has been criticized for lacking racial diversity in its programming. Erin Jensen, *Hallmark Channel's same-sex ad controversy hints at broader diversity issues*, USA TODAY (Dec. 16, 2019), available at https://perma.cc/BM9D-9RCU; *see also* Seth Stevenson, *It's Getting Harder for Hallmark to Avoid Politics*, SLATE (Feb. 17, 2021) (noting that "Hallmark didn't feature Black leads in a Christmas movie until 2018"), available at https://perma.cc/LMR4-CBS2.

[17] In no way do we mean to discourage Maryland judges from using literary references in their opinions. However, as with all the language we choose to include in our

*Tone*

The Appellate Court's opinion contains other remarks that are tonally problematic. At the outset, we question the decision to use defined terms for Belton and Worsley – "Son" and "Mother" – rather than refer to them by name. In the particular circumstances of this case, a reader could take this as a sign of disrespect. The repeated references to the "Son" and the "Mother" throughout the opinion also could be read as hearkening back to the *Beowulf* analogy at the beginning of the opinion, thus increasing the impact of that comparison.

In addition, after noting that the State and Belton agreed that "the assertion, 'This is my block,' was not offered to prove the truth of the thing asserted, to wit, that Calloway enjoyed an entrepreneurial monopoly over the selling of drugs sold in the Monroe-McHenry open-air market," the opinion stated: "That, of course, is the last thing in the world that the Mother and Son, as entrepreneurial rivals of Calloway, would have wished to prove." *Belton and Worsley*, 253 Md. App. at 410. The sarcastic suggestion is that, rather than focusing solely on defending themselves against the charges of murder and accessory after the fact to murder of Calloway, Belton and Worsley also would have been concerned that the jury might mistakenly conclude that Calloway had been the only seller on the block, thereby devaluing their "entrepreneurial" efforts.

With respect to the phrase "Mother-Son combat unit," there was no evidence at trial that Worsley and Belton engaged in any planning concerning their distinct violent

---

opinions, we must ensure that our literary references do not call our impartiality as judges into question.

30

interactions with Calloway. But, even if "Mother-Son combat unit" were a fair description of how Belton and Worsley acted during the fateful minutes on December 6, 2018, we would question that phrase's use in the opinion. Along with the passages we have discussed above and other examples,[18] "Mother-Son combat unit" reveals a degree of ironic distance between the opinion and the people whose lives it affects. This distance might serve some secondary purpose of its writer: intellectual or aesthetic engagement or perhaps the laudable goal of writing prose engaging enough for lay readers. But we judges must demand of ourselves the sound discernment to know when to balance those goals so that nothing obscures the substance of our opinions.

*Belton's Request to Vacate or Recall the Appellate Court's Opinion*

Belton argues that the Appellate Court erred in denying his motion to recall the reported opinion. He asks us to vacate the opinion or to order the Appellate Court to recall it. In support of this request, Belton argues that we should exercise our inherent supervisory authority over the administration of justice in Maryland courts "to prevent the racially-charged metaphors and tropes [the opinion] invokes from being cemented in our jurisprudence." In addition, he contends that vacatur or recall is appropriate because the opinion's factual recitation and legal conclusions concerning self-defense are incorrect,

---

[18] Among other arguably problematic references are the court's description of Worsley's preemptive assault on Calloway as Belton's "Mother taking his place on the fight card"; the court's characterization of Belton as "Byzantinely nuanced in his response" when discussing his and Worsley's decision not to leave the scene after Calloway first displayed "hostile animus" toward them; and the court's description of Belton's reasoning as "truly geopolitical in terms of positioning themselves for future advantage in a potentially violent and competitive marketplace." 253 Md. App. at 442, 445.

and because the opinion violates the party presentation principle and constitutes an advisory opinion.

We cannot conclude that it is appropriate to vacate the opinion in full or to order the Appellate Court to recall it, given that: (1) the Appellate Court correctly affirmed (albeit without any substantive analysis) Belton's conviction for carrying a concealed handgun; and (2) Worsley did not seek further review of the Appellate Court's resolution of her claim of error. Accordingly, those narrow portions of the opinion, 253 Md. App. at 454-56, shall stand. However, we agree with Belton that not just the Appellate Court's ruling regarding harmless error should be overturned. We also disavow the opinion's dicta concerning self-defense and defense-of-others, including its literary analogies, because its analysis is based on flawed or disputed factual premises.

Most notably, the Appellate Court erred in stating that, after subduing Worsley, Calloway "got[] to his feet, turned enough to see [Belton] rapidly approaching, and had taken perhaps a step or two in that direction, when he was hit by a barrage of five bullets and collapsed on top of the Mother. [Belton] was advancing on the spot where Calloway was standing." *Id.* at 440; *see also id.* at 441 ("Triggered by the report 'They're fighting,' it was the Son who advanced, fully armed and with gun in hand, on Calloway and not Calloway who advanced on the Son.") (emphasis in the original). To the contrary, the video footage appears to show that, after getting to his feet, Calloway quickly took several steps toward the corner of Monroe and McHenry Streets. At the same time, Belton quickly moved down McHenry Street, approaching the same corner. Belton came to a stop several feet short of the corner, with the exterior of the grocery store close to him on the right.

32

Calloway then took a few more steps toward the corner and reached a point where the two men were facing each other. A moment later, Belton shot Calloway.

Relatedly, the court erred when it opined that it was

highly improbable that Calloway would have walked away from his tussle with the Mother, walked even a short distance up McHenry Street in a fight with the Son, been shot five times, and then returned (or even to have been able to return) to the spot of the original tussle to fall on top of the Mother, asserting, "The[19] bitch shot me." Calloway obviously believed that he had been shot by the Mother in the course of their fight and not by the Son.

*Id.* at 422; *see also id.* at 423 ("If the Son and Calloway had been staring each other down, as if in a classic Dodge City face-off, Calloway would have known full well who shot him. He would not have collapsed, fatally wounded, on the Mother's body and cried out in shocked surprise, 'The bitch shot me.'").

This conclusion also appears to be inconsistent with the video footage, which appears to show that Calloway indeed did "walk[] away from his tussle with [Worsley], walked … a short distance" to the corner of Monroe and McHenry Streets, where Belton shot at him, "and then returned … to the spot of the original tussle to fall on top of [Worsley]." Thus, the video evidence casts doubt on the Appellate Court's conclusion that Calloway "obviously believed that he had been shot by [Worsley]," rather than Belton.[20]

---

[19] Worsley testified that Calloway said, "This bitch shot me." The Appellate Court misquoted the transcript in two places, substituting "the" for "this."

[20] We agree with Belton that "Calloway's use of the word 'bitch' does not have the effect the [Appellate] Court appears to believe it does because it is not a gender-exclusive term."

Finally, we disagree with the Appellate Court's assessment that Belton's "conclusion that Calloway had a gun seems to have been essentially based on speculative inferences." *Id.* at 440. To the contrary, Belton testified that he saw Calloway taking a small firearm out of his pants after Calloway appeared around the corner from Monroe Street.

At bottom, the factual determinations reached by the Appellate Court are matters to be assessed, if necessary, by the trier of fact. *See Estate of Blair by Blair v. Austin*, 469 Md. 1, 19 (2020) (holding that the Appellate Court "erred in overturning the jury's factual findings based on its own interpretation of the video camera evidence because it had no power to review the finding of the jury upon matters of fact." (Cleaned up)).

Because the Appellate Court's dicta is based on flawed and/or disputed factual premises, it will not constitute the law of the case on remand and should not be cited as authoritative in future cases. We express no view as to whether, on remand, the jury should be instructed on self-defense (or defense-of-others, if Belton requests such an instruction). That will depend on the evidence that is admitted at the retrial.[21]

## V

## Conclusion

Our review of the trial record of this case does not convince us, beyond a reasonable doubt, that the erroneous exclusion of Calloway's statement "This is my block" in no way influenced the verdict. It was not merely cumulative evidence of Calloway's animus;

---

[21] Consistent with our analysis in *Blair*, our comments concerning what the video footage appears to show are not binding on the parties or the trial court on remand.

34

instead, it went to the objective reasonableness of Belton's fear for his life, because it spoke to Calloway's heightened territoriality, the public nature of his declaration, and Belton's fear that he was surrounded by hostile elements. Accordingly, we reverse the judgment of the Appellate Court with respect to Belton's convictions for voluntary manslaughter (Count Two) and use of a firearm in the commission of a crime of violence (Count Three). We order a new trial on those charges. We affirm the judgment of the Appellate Court with respect to Belton's conviction for carrying a concealed handgun.

The right to fair and impartial judges – both in fact and in appearance – extends to appellate proceedings. If the language of an appellate court's opinion could cause a reasonable person to question the participating judges' impartiality or otherwise reasonably suggests bias on the part of the court, then the party potentially injured by that partiality or bias has been deprived of due process, and the court has abused its discretion. We do not decide whether the Appellate Court deprived Belton of due process through the language it used in the opinion's dicta because of our determination with respect to harmless error, which necessitates a new trial. Finally, as explained above, we disavow the opinion's dicta.

> **JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THE APPELLATE COURT WITH THE INSTRUCTION TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY WITH RESPECT TO COUNTS TWO AND THREE OF THE INDICTMENT AND TO REMAND TO THAT COURT FOR A NEW TRIAL ON THOSE COUNTS; COSTS IN THIS COURT AND THE APPELLATE COURT OF MARYLAND TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

Circuit Court for Baltimore City
Case No. 119015009
Argued: October 4, 2022

IN THE SUPREME COURT

OF MARYLAND*

No. 8

September Term, 2022

_____

TERRANCE BELTON

v.

STATE OF MARYLAND

_____

Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,
Getty, Joseph M.
　(Senior Justice, Specially Assigned),

JJ.

_____

Concurring Opinion by Booth, J.,
　which Getty, J., joins.

_____

Filed: May 31, 2023

* At the November 8, 2022, general election,
the voters of Maryland ratified a constitutional
amendment changing the name of the Court of
Appeals of Maryland to the Supreme Court of
Maryland. The name change took effect on
December 14, 2022.

I agree with the Majority's analysis and disposition of question 1 (as reordered and rephrased) pertaining to harmless error, and I join section III of its opinion.

With respect to question 2, I agree with the following conclusions as expressed by the Majority. *First*, that "the right to fair and impartial judges – both in fact and in appearance – extends to appellate proceedings." Maj. Slip Op. at 23. *Second*, "[i]f the language of an appellate court's opinion could cause a reasonable person to question the participating judges' impartiality or otherwise suggests bias on the part of the court, then the party potentially injured by that partiality or bias has been deprived of due process, and the court has abused its discretion." *Id.* (citing *Jackson v. State*, 364 Md. 192, 207 (2001); *Archer v. State*, 383 Md. 329, 356 (2004)). *Third*, because "the Appellate Court erred with respect to the determination of harmless error and that Belton is entitled to a new trial," this Court need not reach the question of "whether the Appellate Court deprived Belton of due process or otherwise abused its discretion through its choice of language in its opinion." *Id.*

It is incumbent that, as judges who are bound to interpret and uphold the rule of law, we use language that is respectful to all persons. In doing so, we must all be aware of our implicit biases, including those related to race, gender, socioeconomic status, sexual orientation, and religion. These are long overdue conversations that are occurring, as they should, not only within the Maryland judiciary, but throughout our society. There are many forums in which to engage in this conversation.

Concerning section IV of the Majority's opinion, I do not believe it is appropriate to parse through the dicta in the Appellate Court's opinion creating dicta of our own. As justices of the Supreme Court of Maryland, it is often our job to carefully interpret and scrutinize language of appellate court opinions where the merits of an issue before us are concerned. But where we are not deciding the merits of a case, "an appellate court should use great caution in exercising its discretion to comment gratuitously on issues beyond those necessary to be decided." *Garner v. Archers Glen Partners, Inc.*, 405 Md. 43, 46 (2008); *see also See NIHC, Inc. v. Comptroller*, 439 Md. 668, 685 (2014) (discussing the wisdom in declining to address questions not before the court); Harry T. Edwards, *The Role of a Judge in Modern Society: Some Reflections on Current Practice in Appellate Adjudication*, 32 Clev. St. L. Rev. 385, 410 (1984) (stating that "[o]ne of the most sacred tenets of appellate decision[-]making in the United States is that, in rendering an opinion, a court should only reach only those issues essential to the resolution of the case before it and should discuss those issues only to the extent necessary to dispose of that matter[]"). Based upon the circumstances present in this case—including the ultimate disposition of this case in which Mr. Belton will receive a new trial—I do not feel compelled in this instance to stray from this maxim of judicial decision-making. For this reason, I respectfully decline to join section IV of the Majority opinion.

Justice Getty has authorized me to state that he joins this opinion.

Circuit Court for Baltimore City
Case No. 119015009
Argued: October 4, 2022

IN THE SUPREME COURT

OF MARYLAND*

No. 8

September Term, 2022

_____

TERRANCE BELTON

v.

STATE OF MARYLAND

_____

Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,
Getty, Joseph M.
    (Senior Justice, Specially Assigned),

JJ.

_____

Concurring Opinion by Gould, J.,
    which Getty, J., joins in part.

_____

Filed: May 31, 2023

* At the November 8, 2022, general election,
the voters of Maryland ratified a constitutional
amendment changing the name of the Court of
Appeals of Maryland to the Supreme Court of
Maryland. The name change took effect on
December 14, 2022.

I agree with the Majority's analysis and disposition of the harmless error issue in section III of its opinion. I write separately to add my own views concerning the State's contention that the excluded testimony was cumulative of other evidence. However, as explained below, I respectfully decline to join section IV of the Majority's opinion entitled "The Appellate Court's Opinion."

**Harmless Error**

Terrance Belton was on trial for murder. That he shot and killed Edward Calloway is not disputed. The issue before the jury was Mr. Belton's state of mind when he pulled the trigger. Did he genuinely feel threatened by Mr. Calloway? Did he reasonably perceive the nature of the threat? Did he counter the threat with a reasonable level of force? These were among the critical questions before the jury. Everything that Mr. Belton heard Mr. Calloway say that morning was fair game.

The State argues that Mr. Calloway's statement "This is my block" was cumulative of other evidence showing Mr. Calloway's animus towards Mr. Belton. To the contrary, as explained in the Majority's opinion, that statement imparted a potentially different message than Mr. Calloway's other comments that morning. But even if it didn't convey a different message, I would still hold that the evidence was not cumulative. My reasoning is simple—with Mr. Belton's testimony on the issue excluded, the jury never learned that Mr. Belton heard Mr. Calloway say "This is my block."

The jury had to assess the *entirety* of the encounter, both subjectively through Mr. Belton's eyes and ears, and objectively from the standpoint of a "reasonable person." *State v. Marr*, 362 Md. 467, 473 (2001) ("Perfect self-defense requires not only that the killer

subjectively believed that his actions were necessary for his safety but, objectively, that a reasonable man would so consider them." (quoting *State v. Faulkner*, 301 Md. 482, 500 (1984)).

In a tense, confrontational setting, words matter—all of them—to how one perceives and reacts to a threat. Indeed, the fact that an aggressor made repeated threats or expressed animus in multiple ways may have independent relevance to a defendant's subjective perception of the danger and a jury's assessment of the encounter. By preventing Mr. Belton from fully detailing the facts and circumstances that culminated in the shooting of Mr. Calloway, the jury was forced to view the events through a narrowed, and hence distorted, lens. The erroneous exclusion of that testimony was, therefore, not harmless.

## The Appellate Court's Opinion

In addition to the harmless error question, the Court granted writ of certiorari to decide the following issues regarding the dicta in the Appellate Court's opinion:

1. As a matter of first impression, does a criminal defendant's right to a fair and impartial judge and the appearance of a fair and impartial judge extend to appellate proceedings?
2. Does the intermediate appellate court's reported opinion, containing racially-charged comparisons, analogies of the appellants to literary monsters, disparagement of the Baltimore City community in which the events underlying the case took place, and a lengthy explanation of why petitioner's mother, a co-appellant, was not entitled to be viewed with the compassion generally afforded to mothers, all in dicta unnecessary to the Court's holding violate petitioner's right to fair and impartial judges and the appearance of fair and impartial judges?
3. Did the [Appellate Court] err in denying petitioner's Motion to Recall and Reconsider Reported Opinion where the opinion denies petitioner's right to fair and impartial judges and the appearance of fair and impartial judges?

2

I agree with the Majority that, in answer to the first question, "the right to fair and impartial judges – both in fact and in appearance – extends to appellate proceedings." Maj. Op. 23.  I otherwise decline to join section IV of the Majority's opinion.

"[N]othing is better settled than the principle that courts should not decide constitutional issues unnecessarily." *Pro. Staff Nurses Ass'n v. Dimensions Health Corp.*, 346 Md. 132, 139 (1997) (quoting *State v. Raithel*, 285 Md. 478, 484 (1979)).  The Majority purports to follow that practice when it states that it is neither deciding whether Mr. Belton was deprived of due process in the Appellate Court nor whether that Court "abused its discretion through its choice of language in its opinion."  Maj. Op. 23.  But after making this statement, the Majority then devotes over ten pages of *obiter dictum* to dissecting the Appellate Court's opinion and explaining how its literary and artistic references and overall tone could be interpreted as troubling and inappropriate.  Respectfully, in purporting to decline to address the due process issue and then endorsing Mr. Belton's substantive analysis of the opinion on which his due process argument is predicated, the Majority is trying to have it both ways.

Mr. Belton raises important issues concerning race and gender that have been, and will continue to be, discussed and debated in social, political, and academic circles, as they should be.  If confronting these issues were necessary to resolve the case before us, I would do so without reluctance or hesitance.  But having resolved this case on the only substantive issue raised by Mr. Belton—the harmless error issue—and consistent with our tradition of not issuing advisory opinions, we should exercise judicial restraint.  Unless necessary to

3

resolve an issue before us, this Court is not in the business of critiquing the language and tone of our colleagues' judicial opinions, nor should we be.

Much has been written in scholarly journals about the appropriateness of using literary allusions in judicial opinions,[1] and I understand and respect the views of Mr. Belton, the Majority, and others who have criticized the opinion of the Appellate Court. However, some of the Majority's criticisms are unjustified and fail to accord our colleagues on the Appellate Court the benefit of the doubt they deserve. *See Jefferson–El v. State,* 330 Md. 99, 107 (1993) (noting that judges are presumed to be impartial). I will offer three examples.

First, the Majority goes out of its way to exonerate the Appellate Court of intentional bias, but implies that the Appellate Court may have been driven by implicit racial bias. *See* Maj. Op. 25 ("[W]e are certain that the author of the opinion, the Honorable Charles E. Moylan, Jr., the two other judges on the panel, and the other judges of the Appellate Court who voted to report the opinion did not *intend* to decide [this case] based on any impermissible considerations, including race.") (emphasis added); *id.* (explaining that

_____

[1] *See, e.g.*, Kristin B. Gerdy Kyle, *Big Brother, Othello, and Dogs That Don't Bark: The Use of Literary Allusion in Federal Appellate Opinions*, 29 S. CAL. INTERDISC. L.J. 427 (2020); Adalberto Jordan, *Imagery, Humor, and the Judicial Opinion*, 41 U. MIAMI L. REV. 693 (1987); Richard A. Posner, *Judges' Writing Styles (And Do They Matter?)*, 62 U. CHI. L. REV. 1421 (1995); Robert A. Ferguson, *The Judicial Opinion as Literary Genre*, 2 YALE J. L. & HUMANS. 201 (1990); Barb Howard, *Literary Judgements: Doing More Harm Than Good?*, 22 GREEN BAG 2D 125 (2019); John M. DeStefano III, *On Literature as Legal Authority*, 49 ARIZ. L. REV. 521 (2007); Nina Varsava, *Professional Irresponsibility and Judicial Opinions*, 49 HOUS. L. REV. 103 (2021); Elwyn Elms, *On the Use of Classical Allusions in Judgment Writing*, 31(1) UNIV. NEW S. WALES L. J. 56 (2008).

4

"literary analogies and other comparisons that could be interpreted as evoking racial stereotypes or suggesting that they are the product of implicit bias"). The Appellate Court's opinion, however, does not mention, let alone discuss, the race of Mr. Belton, Ms. Worsley, Mr. Calloway, or any of the witnesses. Moreover, the opinion's descriptions of the parties and the city block where the events occurred came directly from the evidence adduced at the trial. Thus, our current jurisprudence offers no basis to allege judicial bias here. *See Doering v. Fader*, 316 Md. 351 (1989) ("The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)). Without evidence of an "extrajudicial source" of bias, this Court should not endorse speculation that implicit bias, adopted by the Majority as "unconscious associations and judgments," Maj. Op. 25 n.14 (quoting Anthony G. Greenwald and Mahzarin R. Banaji, *Implicit social cognition: Attitudes, self-esteem, and stereotypes*, PSYCHOLOGICAL REVIEW, Vol 102(1), Jan 1995, 4-27), may have animated the Appellate Court's use of literary and artistic references.

Second, the Majority contends that the "Demythologizing 'Mother'" section of the Appellate Court's opinion "call[s] to mind narratives about African American women as angry and less than virtuous, thereby suggesting that Worsley did not deserve the sympathy that might naturally be extended to the more elderly White mothers and grandmothers depicted by Whistler, Rockwell, and Currier & Ives." Maj. Op. 28-29 (footnote omitted). Respectfully, in addition to the lack of any mention of Ms. Worsley's race, I find nothing in the opinion that describes her as "angry." Nor do I see language in the Appellate Court's

5

opinion that questions the virtues of African American women or suggests that African American women are sexually promiscuous, lazy, and have loose personal morals as described in the articles cited by the Majority. *See* Maj. Op. 28 n.15. The implication that the Appellate Court's opinion fuels such narratives is unwarranted.

Finally, the Majority asserts that the opinion's use of the defined terms of "Son" and "Mother" could be taken "as a sign of disrespect," and again raises the possibility of racial bias by linking the use of those terms with the *Beowulf* reference at the beginning of the opinion. Maj. Op. 30. However, the use of defined terms such as "Son," "Father," and "Mother" is an oft-used convention in opinions from both of Maryland's appellate courts.[2]

---

[2] *See, e.g.*, *In re T.K.*, 480 Md. 122 (2022) (Fader, C.J., used "Mother" and "Father"); *Westley v. State*, 251 Md. App. 365 (2021) (Fader, C.J., used "Mother" and "Brother"); *Wagner v. State*, 445 Md. 404 (2015) (Watts, J., used "Father"); *Junek v. St. Mary's Cnty. Dep't of Soc. Servs.*, 464 Md. 350 (2019) (Hotten, J., used "Mother" and "Father"); *In re Adoption/Guardianship of C.E.*, 464 Md. 26 (2019) (Getty, J., used "Mother" and "Father"); *In re X.R.*, 254 Md. App. 608 (2022) (Wells, C.J., used "Mother" and "Child"); *Caldwell v. Sutton*, 256 Md. App. 230 (2022) (Graeff, J. used "Mother," "Father," "Child," and "Grandmother"); *Meyer v. Meyer*, 193 Md. App. 640 (2010) (Kehoe, J., used "Mother," "Father," "Son," and "Daughter"); *J.A.B. v. J.E.D.B.*, 250 Md. App. 234 (2021) (Berger, J., used "Mother" and "Father"); *In re M.C.*, 245 Md. App. 215 (2020) (Nazarian, J., used "Mother"); *Gizzo v. Gerstman*, 245 Md. App. 168 (2020) (Arthur, J., used "Mother," "Father," and "Grandfather"); *Basciano v. Foster*, 256 Md. App. 107 (2022) (Leahy, J., used "Mother" and "Father"); *In re B.C.*, 234 Md. App. 698 (2017) (Reed, J., used "Mother"); *In re R.S.*, 242 Md. App. 338 (2019) (Friedman, J., used "mother" and "father"); *Matter of Sulerzyski*, 257 Md. App. 215 (2023) (Beachley, J., used "Mother"); *In re K.H.*, 253 Md. App. 134 (2021) (Ripken, J., used "Mother" and "Grandmother"); *Best v. Fraser*, 252 Md. App. 427 (2021) (Wright, J., used "Mother" and "Father"); *Jose v. Jose*, 237 Md. App. 588 (2018) (Kenney, J., used "Mother," "Father," and "Daughter"); *In re K.L.*, 252 Md. App. 148 (2021) (Eyler, D., J., used "Mother"); *Poole v. Bureau of Support Enforcement*, 238 Md. App. 281 (2018) (Battaglia, J., used "Mother" and "Father"); *In re Adoption/Guardianship of H.W.*, 460 Md. 201 (2018) (Adkins, J., used "Mother," "Father," "Sister," and "Brother"); *Goicochea v. Goicochea*, 256 Md. App. 329 (2022) (Moylan, J.,

I recognize that this convention is ordinarily used in family law matters in which familial relationships among the parties are inherently relevant, and one could certainly contend that is not the case here. But to the Appellate Court, the mother-son relationship between Ms. Worsley and Mr. Belton was, rightly or wrongly, important to its analysis of the self-defense issue, so its use of this convention was understandable in that context. In the face of a probable and innocuous explanation, our colleagues should be afforded the benefit of the doubt.

In sum, where, as here, judicial commentary is untethered to an issue requiring our resolution and there is no evidence of racial bias, this Court should not stoke concerns about the racial dimensions of an Appellate Court's opinion or critique its language and tone. Accordingly, I respectfully decline to join section IV of the Majority's opinion.

Justice Getty has authorized me to state that he joins in the section titled "The Appellate Court's Opinion" of this opinion.

used "Wife" and "Husband"); *Alexander v. Alexander*, 252 Md. App. 1 (2021) (Salmon, J., used "Mother" and "Father").