*Harford Memorial Hospital, Inc. v. Josephine Jones,* et al., No. 377, September Term, 2023. Opinion by Albright, J.

**JUDGES – DISQUALIFICATION TO ACT – OBJECTIONS TO JUDGE, AND PROCEEDINGS THEREON**

Strong presumption exists that judges are impartial participants in the legal process.

**APPEAL AND ERROR – PRESENTATION AND RESERVATION IN LOWER COURT OF GROUNDS OF REVIEW – OBJECTIONS AND MOTIONS, AND RULINGS THEREON – NECESSITY OF SPECIFIC OBJECTION – IN GENERAL**

A claim of judicial bias by a trial court must be preserved during trial and the party claiming bias must meet four requirements: (1) that facts be set forth in reasonable detail sufficient to show purported bias of the trial judge; (2) that those facts are set forth in the presence of opposing counsel and judge who is the subject of the bias charge; (3) that counsel not be ambivalent in setting forth their position regarding the bias charge; and (4) that the relief sought must be stated with particularity and clarity.

**APPEAL AND ERROR – REVIEW – SCOPE AND EXTENT OF REVIEW – PROCEDURAL MATTERS IN GENERAL – JUDGE – BIAS, RECUSAL, AND DISQUALIFICATION**

A litigant claiming bias on the part of the trial judge must generally move for relief as soon as the basis for it becomes known and relevant.

**JUDGES – DISQUALIFICATION TO ACT – OBJECTIONS TO JUDGE, AND PROCEEDINGS THEREON – DETERMINATION OF OBJECTIONS**

Strong presumption of trial judge's impartiality was not rebutted in jury trial resulting in unfavorable verdict for the employer of a Black doctor but not the co-defendant White doctor; the evidentiary rulings and conduct by the trial judge comported with rules of evidence and were not an abuse of discretion.

**JUDGES – DISQUALIFICATION TO ACT – BIAS AND PREJUDICE – IN GENERAL**

Preservation is particularly important in regard to claims of implicit bias on the part of a trial judge.

**APPEAL AND ERROR – PRESENTATION AND RESERVATION IN LOWER COURT OF GROUNDS OF REVIEW – OBJECTIONS AND MOTIONS, AND RULINGS THEREON – NECESSITY OF SPECIFIC OBJECTION – IN GENERAL**

A claim of judicial bias is not preserved when Appellant, knowing facts that Appellant claims show a trial judge's alleged bias, fails to bring those facts to the trial judge's attention, fails to charge the trial judge with bias, and fails to ask for relief with particularity and clarity.

Circuit Court for Harford County
Case No. C-12-CV-18-000307

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 377

September Term, 2023

_____

HARFORD MEMORIAL HOSPITAL, INC.

v.

JOSEPHINE JONES, ET AL.

_____

Graeff,
Berger,
Albright,

JJ.

_____

Opinion by Albright, J.

_____

Filed: February 28, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This appeal arises from a medical malpractice suit brought by the family of Gerald Jones ("Appellees") in the Circuit Court for Harford County. Mr. Jones presented at the emergency room of Appellant Harford Memorial Hospital ("HMH") one evening complaining of stomach pain. After diagnosing Mr. Jones with an inguinal hernia and incarcerated bowel, general surgeon Dr. Alexander Aurora performed abdominal surgery on Mr. Jones. Two days later, Mr. Jones died suddenly of a pulmonary embolism, which occurs when a blood clot from elsewhere in the body migrates through the blood stream and lodges in a blood vessel in the lung. Appellees' complaint alleged that Dr. Aurora, the on-call general surgeon at HMH who performed Mr. Jones's surgery, and Dr. Robert Kennedy, a hospitalist employed by HMH who treated Mr. Jones after surgery, negligently failed to prevent, diagnose, and treat the pulmonary embolism that caused Mr. Jones's death.

After an eight-day trial, a jury found that Dr. Aurora was not negligent, but that HMH's employee, Dr. Kennedy, was. The jury awarded Appellees just over $1.2 million in damages from HMH. Following the verdict, HMH timely moved for a new trial, alleging that the trial court's disparate treatment of Dr. Aurora, who is White,[1] and Dr. Kennedy, who is Black, deprived HMH of its right to a fair and impartial trial. The trial court denied that motion, and HMH filed this timely appeal.

---

[1] Following the lead of HMH in its initial brief, we will capitalize "Black" and "White" when referring, respectively, to the races of Dr. Kennedy and Dr. Aurora. We note that HMH did not capitalize "white" when referring to the race of Dr. Aurora in its new trial motion (and supporting memorandum) below. When quoting from this motion, we will capitalize as HMH did. We mean no disrespect either way.

On appeal, HMH presents one question for review:

> Did the circuit court violate Harford Memorial Hospital's right to due process through a pattern of prejudicial and disparate evidentiary rulings relating to Dr. Kennedy and err in denying the motion for a new trial?

For the reasons below, we answer that question "no." Accordingly, we affirm the judgment of the circuit court.

## BACKGROUND

### I.    Treatment of Mr. Jones

Mr. Jones arrived at the emergency room of HMH the evening of September 18, 2017, complaining of stomach pain. Dr. Aurora evaluated Mr. Jones and diagnosed him with an inguinal hernia and incarcerated bowel. At first, Dr. Aurora opted for more conservative treatment in hopes that Mr. Jones's bowel obstruction would resolve itself naturally. But seeing little progress by the following morning, Dr. Aurora concluded that Mr. Jones would need abdominal surgery.

In planning for Mr. Jones's surgery, Dr. Aurora considered prophylactic measures to reduce blood clotting. Such measures are common before and after surgery because surgery can increase blood clot formation and, thus, the risk of venous thromboembolism ("VTE"). As one expert explained, VTE is a condition where a blood clot, usually formed in blood vessels in the legs, breaks free and migrates throughout the bloodstream, eventually lodging in a blood vessel and blocking blood flow. When such a blockage forms in a blood vessel in the lungs, it is known as a pulmonary embolism. Depending on its size and location, a pulmonary embolism can be a life-threatening condition.

Weighing Mr. Jones's VTE risk factors, Dr. Aurora decided not to administer

anticoagulation medication before surgery. Instead, he treated Mr. Jones with sequential compression devices ("SCDs"). As another expert testified, SCDs are a more conservative VTE prophylaxis that involves inflatable sleeves worn on the legs that mechanically promote blood circulation to prevent clotting.

Dr. Aurora performed Mr. Jones's abdominal surgery on the evening of September 19 with no complications. Mr. Jones received post-operative care from Dr. Aurora and his assigned hospitalist, Dr. Kennedy. As part of his post-operative care, Mr. Jones continued to wear the SCDs, but, as before, he did not receive anticoagulation medication. The next morning, September 20, Mr. Jones appeared to be recovering well. Both Dr. Aurora and Dr. Kennedy examined Mr. Jones and found that, aside from complaints of pain and a slightly elevated heart rate, his condition was as expected.

However, when Mr. Jones first attempted to walk that afternoon, he experienced a near-syncopal episode—that is, he felt suddenly weak and light-headed and nearly fainted. Immediately following that episode, his condition deteriorated. Several of Mr. Jones's vital signs reached abnormal values: his respiration and heart rate rose significantly, while his blood pressure and oxygen saturation fell sharply. Dr. Kennedy was informed of the changes in Mr. Jones's vital signs. Suspecting that Mr. Jones was simply dehydrated, Dr. Kennedy prescribed additional pain medication and IV fluids, but took no other action.

Testimony at trial by Appellees' expert in pathology indicated that Mr. Jones's near-syncopal episode and the subsequent deterioration of his condition on the afternoon of September 20 were likely caused by a small pulmonary embolism separate from the

3

larger, fatal pulmonary embolism that he suffered the next day. Based on his review of Mr. Jones's autopsy results, the pathologist testified to his opinion that Mr. Jones suffered a small pulmonary embolism that lodged in a peripheral blood vessel in his lung around twenty-four hours before his death. Unlike the subsequent fatal embolism, which lodged in Mr. Jones's pulmonary artery[2] and completely blocked blood flow between his heart and lungs, this embolism likely lodged in a smaller peripheral blood vessel and thus did not completely block blood flow. The pathologist testified that Mr. Jones's near-syncopal episode and the subsequent changes to his vital signs were consistent with having suffered such an embolism.

Over the course of the afternoon and evening of September 20, Mr. Jones's vital signs remained abnormal. Mr. Jones's treatment records do not show that Dr. Kennedy visited Mr. Jones on the afternoon of September 20 to perform any examination or follow-up after the near-syncopal episode.

The following morning, September 21, Dr. Kennedy and Dr. Aurora received messages from an attending nurse, Heather Askew, indicating that Mr. Jones's heart rate, respiratory rate, and oxygenation had improved overnight but were still abnormal, and that Mr. Jones was experiencing anxiety and shortness of breath. Dr. Kennedy visited Mr. Jones to evaluate. Following the evaluation, Dr. Kennedy ordered several additional diagnostic tests but did not otherwise modify Mr. Jones's treatment.

Around noon that day, a nurse found Mr. Jones face-down on the floor and

---

[2] According to expert testimony, the pulmonary artery is the main blood vessel that carries deoxygenated blood from the heart to the lungs.

4

unresponsive. Despite the resuscitation efforts of Dr. Kennedy and HMH emergency staff, Mr. Jones passed away shortly thereafter. An autopsy established that Mr. Jones's death was caused by a large pulmonary embolism that became lodged in and blocked his pulmonary artery.

## II.    Appellees' Complaint

In June 2018, Mr. Jones's family sued Dr. Aurora, Dr. Kennedy, and their respective employers: Upper Chesapeake Surgical Associates[3] and HMH.[4] Appellees alleged that Dr. Aurora and Dr. Kennedy committed medical malpractice when they failed to prevent, diagnose, and treat Mr. Jones's VTE and fatal pulmonary embolism. They alleged that Dr. Aurora should have prescribed anticoagulation medication as a prophylaxis against VTE instead of relying on less effective SCDs. As for Dr. Kennedy, Appellees alleged that based on Mr. Jones's condition following his near-syncopal episode, the relevant standard of care required Dr. Kennedy to perform an in-person examination and to include pulmonary embolism in his differential diagnosis. Appellees asserted that if Dr. Kennedy had done either, he would have been able to diagnose Mr. Jones's VTE and administer anticoagulant medication that would have prevented the fatal pulmonary embolism. The eight-day jury trial occurred in February 2023.

---

[3] Upper Chesapeake Surgical Associates is a surgical group that operated at HMH and other medical facilities.

[4] Several other providers were included in Appellees' initial complaint but were subsequently dismissed voluntarily. Before trial began, the parties also agreed to the dismissal of Dr. Kennedy as a named defendant but stipulated that Dr. Kennedy acted as an employee of HMH and that it was his alleged negligence alone that formed the basis of Appellees' claims against HMH.

### III. Testimony of Dr. Kennedy and Dr. Aurora[5]

HMH called Dr. Kennedy as a witness during trial. Dr. Kennedy was unable to attend the trial in person, and therefore testified remotely, because he was serving as primary support and caregiver for his wife, who had been recently diagnosed with a significant brain tumor, and their two young children. Before trial, the parties had discussed with the trial court how Dr. Kennedy's physical absence would be explained to the jury. Due to concerns of eliciting unfair sympathy, the trial court had decided that Dr. Kennedy would be permitted to testify that he was unable to attend trial in person because of "personal family reasons" but would not be permitted to explain that those circumstances were health-related or to testify specifically about his wife's health condition. However, early in direct examination, counsel for HMH asked Dr. Kennedy whether he was unable to attend trial because of "personal family health issues[.]" The trial court sustained Appellees' objection to that question.

Appellees raised numerous objections during direct examination of Dr. Kennedy.[6]

---

[5] Both parties also introduced expert testimony to support their theories as to Dr. Kennedy's care. Thus, Appellees offered testimony that Dr. Kennedy breached the standard of care by failing to include pulmonary embolism in his differential diagnosis of Mr. Jones, that that breach caused Mr. Jones's death, and that if Mr. Jones had been timely treated with therapeutic doses of anticoagulation medication, he likely would have survived. HMH offered competing expert testimony purporting to show that the treatment decisions made by Dr. Kennedy were within the standard of care, and that Dr. Kennedy was not required to include pulmonary embolism on his differential diagnosis of Mr. Jones.

[6] Below, HMH would later argue that the number of objections by Appellees' counsel, and the resulting "admonishments" by the trial court directing Dr. Kennedy to respond more directly and briefly, contributed to Dr. Kennedy's disparate treatment and

Many of Appellees' objections were to the form of the question asked of Dr. Kennedy, but on several occasions, Appellees also objected to what they saw as overbroad answers given by Dr. Kennedy. The trial court sustained several of those objections, and on three occasions, the trial court asked Dr. Kennedy to limit his responses to the question posed.

During cross-examination, Appellees also asked Dr. Kennedy about Nurse Askew's note from the morning of Mr. Jones's death indicating that Mr. Jones's vital signs remained abnormal and that he was experiencing anxiety and shortness of breath. HMH objected on the grounds that the note was not relevant. Specifically, according to Appellees' theory of the case, Mr. Jones's death could no longer have been prevented by administration of anticoagulation treatment at the time that Dr. Kennedy became aware of the note, and therefore testimony about the note had no bearing on the question of whether Dr. Kennedy's alleged negligence caused Mr. Jones's death. The trial court overruled HMH's objection, and Dr. Kennedy answered that he did not share the nurse's recollection about Mr. Jones experiencing anxiety and shortness of breath.

Appellees also asked Dr. Kennedy about deposition testimony given by Dr. Aurora. Dr. Aurora had stated that, shortly after Mr. Jones's death, Dr. Kennedy had asked his opinion as to whether Appellees were likely to sue them. The trial court overruled HMH's objection to the question. Dr. Kennedy testified that he did not recall asking that of Dr. Aurora or reading Dr. Aurora's deposition testimony about the alleged conversation.

---

prevented a fair trial for HMH. Before us, however, HMH does not ascribe this disparate treatment and unfairness to opposing counsel.

Dr. Aurora was called after Dr. Kennedy. Unlike Dr. Kennedy, Dr. Aurora testified in person. At the beginning of his direct examination, Dr. Aurora's counsel asked him to explain why he had gotten into medicine. Over Appellees' objection, the trial court allowed Dr. Aurora to explain that both his parents had died during his childhood and that he pursued a career in medicine in hopes of preventing such an outcome for others. Appellees made considerably fewer objections during counsel's direct examination of Dr. Aurora than they had during HMH's direct examination of Dr. Kennedy.

On cross-examination, Appellees asked Dr. Aurora about Nurse Askew's communications to both doctors received the morning of Mr. Jones's death. Counsel objected, arguing again that Nurse Askew's message to Dr. Aurora was not relevant to Appellees' theory of the case. Counsel also pointed out that the questioning was beyond the scope of direct examination. After his initial post-surgical follow-up and evaluation on the morning of September 20, Dr. Aurora had minimal involvement in Mr. Jones's ongoing care. Consequently, counsel had limited the operative timeframe during direct examination of Dr. Aurora to the afternoon of September 20. The trial court sustained counsel's objection to questioning Dr. Aurora about the message, and it noted that Dr. Aurora did not visit Mr. Jones on September 21 and so could not speak to his actual condition.

At the bench conference on that objection, Appellees also stated that they planned to ask Dr. Aurora about the alleged conversation with Dr. Kennedy following Mr. Jones's death. Counsel for Dr. Aurora indicated that he planned to object to any such questioning

8

because testimony about such a conversation would have minimal probative value and would improperly suggest to the jury that the doctors had a culpable state of mind. Counsel also pointed out that Dr. Kennedy had already denied that the conversation took place, and so any testimony from Dr. Aurora could appear particularly prejudicial to him. Having heard this further explanation, the trial court sustained counsel's objection.

## IV.    HMH's Request to Recall Dr. Kennedy or for a Stipulation

Before the close of evidence but after its renewed motion for judgment, HMH raised the issue of Dr. Kennedy's treatment as a witness. HMH asserted that while Dr. Kennedy had been prevented from testifying about his wife's condition out of concern about unfair sympathy, the trial court allowed Dr. Aurora to present testimony about why he chose a career in medicine. To remedy this, HMH requested permission to recall Dr. Kennedy or, alternatively, that the trial court "craft a message" to the jury about Dr. Kennedy's remote testimony.[7] At this time, HMH also pointed out that the trial court had ruled differently on objections to questions to Dr. Kennedy and Dr. Aurora about the same events. And it asserted that the trial court had admonished Dr. Kennedy about his responses but given Dr. Aurora considerable leeway in testifying.[8] The trial court denied HMH's request to recall Dr. Kennedy, but it agreed to provide a non-specific jury instruction indicating that the jury should not draw any negative inferences from the fact

---

[7] We assume counsel was seeking a stipulation about the reason for Dr. Kennedy's having appeared remotely.

[8] HMH now characterizes this discussion as one regarding disparate treatment of the doctors, but HMH did not raise judicial bias at the time.

that any witness or party testified remotely.

## V. The Verdict

After deliberation, the jury found that Dr. Aurora did not violate the relevant standard of care in providing prophylactic VTE treatment to Mr. Jones, but Dr. Kennedy did violate the relevant standard of care in failing to diagnose and treat Mr. Jones's VTE following the near-syncopal episode on the afternoon of September 20. The jury awarded $1,204,344 in damages for Appellees against HMH.

## VI. HMH's New Trial Motion[9]

Following the jury's decision, HMH moved for a new trial based on the trial court's alleged disparate treatment of Dr. Kennedy. HMH argued that HMH, and Dr. Kennedy as its employee, were denied a fair trial in three instances of unequal treatment by both plaintiffs' counsel and the trial court:

> 1) [Dr. Kennedy] was prevented from explaining his personal circumstances and why he was unable to be present for trial while Dr. Aurora was permitted to emphasize his daily presence; 2) he was repeatedly interrupted and admonished to answer the question and not extrapolate while Dr. Aurora was given leeway to answer questions with the length and breadth that he saw fit; and 3) he was questioned about irrelevant and highly prejudicial post-death notes and conversations while Dr. Aurora was protected from having to answer those exact same questions.

HMH clarified its belief that the trial court did not intentionally mistreat Dr. Kennedy, but cited to *Braxton v. Faber*, 91 Md. App. 391, 405 n.6 (1992), for the principle that

---

[9] In a separate motion, HMH moved for judgment notwithstanding the verdict, or in the alternative for a new trial, on the ground that the evidence was insufficient to show that the negligence alleged against Dr. Kennedy was the cause of Mr. Jones's death. The trial court denied this motion as well. HMH does not challenge this ruling here.

courts "should take great pains to avoid facial expressions, gestures, and body language which could be construed as impatience or intolerance directed to either side" because "even unintended manifestations of bias have the same potential for improperly influencing a jury as verbal expressions of incredibility or disbelief directed at either party."

HMH claimed the "materially different treatment of two similarly situated defendant physicians was even more unfairly prejudicial here because Dr. Kennedy, a Black physician, had to defend himself with a white co-defendant in front of an all-white jury." HMH contended that "[i]n such circumstances, the risk of unfair, implicit bias affecting juror deliberations is even more heightened." HMH argued that the unequal treatment given to Dr. Kennedy deprived HMH of a fair trial, and the only remedy was a new trial.

Appellees countered that there was no evidence of bias or unequal treatment of Dr. Kennedy. According to Appellees, the jury was appropriately advised on Dr. Kennedy's reasons for not being present in the courtroom, because informing the jury further about Dr. Kennedy's personal circumstances would have elicited improper sympathy from the jury. Appellees also argued that both doctors were treated fairly during their testimony and that the trial court rightfully permitted cross-examination of Dr. Kennedy on the events of September 21 (including Nurse Askew's note and the conversation with Dr. Aurora). Appellees took issue with HMH's unsupported assumption that the jury formed a negative impression of Dr. Kennedy based on the trial court's rulings. Further, Appellees note that HMH failed to object contemporaneously to the evidentiary rulings it

11

challenged. Like HMH, Appellees also cited to *Braxton*, though only to point out that HMH never raised racial bias during trial, counter to the requirements for preserving such a claim.

The trial court denied the motion without a hearing. This timely appeal followed.

## STANDARD OF REVIEW

We review a decision about the admissibility of evidence for abuse of discretion unless it involves a pure legal question. *Hall v. Univ. of Md. Med. Sys. Corp.*, 398 Md. 67, 82 (2007). We review the denial of a motion for a new trial for abuse of discretion. *Mahler v. Johns Hopkins Hosp., Inc.*, 170 Md. App. 293, 321 (2006). A trial court abuses its discretion when it makes a decision that is "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *North v. North*, 102 Md. App. 1, 14 (1994).

## THE PARTIES' CONTENTIONS

On appeal, HMH's argument is twofold. HMH argues first that the trial court abused its discretion in ruling against Dr. Kennedy on three evidentiary issues by: (1) preventing testimony about how Dr. Kennedy's wife's health condition kept him from traveling; (2) allowing cross examination of Dr. Kennedy about Nurse Askew's note; and (3) allowing cross examination of Dr. Kennedy about the alleged conversation between Dr. Kennedy and Dr. Aurora concerning the possibility of litigation. HMH asserts that those three errors, standing alone, merit reversal of the trial court's judgment.

HMH's second argument is that the trial court abused its discretion by treating Dr. Kennedy differently from Dr. Aurora. HMH refers to the three allegedly erroneous

evidentiary rulings against Dr. Kennedy and asserts that the trial court made correct, but inconsistent, evidentiary rulings under analogous circumstances during Dr. Aurora's testimony by: (1) allowing Dr. Aurora to present sympathetic background testimony about why he became a doctor; (2) preventing questioning of Dr. Aurora about Nurse Askew's note; and (3) preventing questioning of Dr. Aurora about the alleged conversation concerning the possibility of litigation. HMH also alleges that the trial court was more critical of Dr. Kennedy when it admonished him in front of the jury several times for purportedly unresponsive testimony, but did not do so when Dr. Aurora gave similarly unresponsive testimony.

HMH's position is that the cumulative effect of the trial court's disparate treatment of Dr. Kennedy and Dr. Aurora—that is, the inconsistent evidentiary rulings and the criticism of Dr. Kennedy—was to "create[] the appearance of partiality to Dr. Aurora and deprive[] [HMH] of a fair trial." HMH also stresses that the trial court's disparate treatment of Dr. Kennedy was not intentional but urges that it must nonetheless be viewed through the lens of implicit racial bias.

Appellees, on the other hand, maintain that the circuit court's judgment should be affirmed. They stress that HMH does not raise any challenge to the sufficiency of the evidence against Dr. Kennedy, nor does HMH deny that the jury's verdict was supported by the medical evidence. Appellees emphasize that the medical evidence, including the testimony of their expert witness, established all the elements of a medical negligence claim.

Appellees argue that the trial court did not abuse its discretion in its evidentiary

rulings during Dr. Kennedy's testimony. Appellees point out that the trial court's ruling preventing Dr. Kennedy from testifying about his wife's medical condition was consistent with the pre-trial ruling on the question, which HMH did not and does not challenge. Appellees also assert that the trial court did not abuse its discretion in allowing questioning of Dr. Kennedy about the conversation with Dr. Aurora and Nurse Askew's note because such questioning went to Dr. Kennedy's credibility as a witness.

Appellees reject HMH's comparison between Dr. Kennedy's testimony about his wife's health condition and Dr. Aurora's testimony about his parents' deaths. They also point out that HMH's allegations of disparate treatment by the trial court rely on the substantial difference in number of objections raised by opposing counsel during the doctors' respective testimony, a circumstance allegedly beyond the trial court's control. And they note that while the trial court did admonish Dr. Kennedy to provide responsive testimony, it made similar admonishments to at least one other witness during the proceedings.

Finally, Appellees characterize HMH's claims of racial bias as "bald, unsubstantiated, and speculative" and assert that HMH "does not identify a scintilla of evidence establishing that the jury's verdict was influenced by racial bias." Appellees point out that there is a strong presumption in Maryland that judges are impartial and unbiased, and they assert that HMH cannot overcome this presumption because it does not put forward any evidence of partiality or bias from the trial court.

## DISCUSSION

Maryland law guarantees litigants the right to a judge who is, and has the

14

appearance of being, unbiased and impartial. *State v. Payton*, 461 Md. 540, 559 (2018) ("It is well settled in Maryland that fundamental to a defendant's right to a fair trial is an impartial and disinterested judge. The right to an impartial and disinterested judge includes the right to a judge with the appearance of being impartial and disinterested.") (cleaned up). Violation of the right to an impartial and disinterested judge constitutes a deprivation of the party's right to due process and an abuse of discretion by the judge. *Archer v. State*, 383 Md. 329, 356 (2004); *Jackson v. State*, 364 Md. 192, 207 (2001). Although due process concerns are more commonly implicated in criminal cases, "the right to a fair and impartial trial is no less deserving of protection in a civil setting as it is in the criminal courts." *Dinkins v. Grimes*, 201 Md. App. 344, 361 (2011).

Recently, we reaffirmed Maryland's "strong presumption" that "judges are impartial participants in the legal process." *Baltimore Cotton Duck, LLC v. Ins. Comm'r of the State of Md.*, 259 Md. App. 376, 402 (2023) (quoting *Jefferson-El v. State*, 330 Md. 99, 107 (1993)), *cert. denied sub nom. Baltimore Cotton Duck, LLC v. Ins. Comm'r of State,* 486 Md. 396 (2024).[10] This presumption has existed in criminal and civil cases

---

[10] Appellant Baltimore Cotton Duck, LLC ("BCD") was the creditor and landlord of an insolvent health maintenance organization ("HMO"). *Baltimore Cotton Duck, LLC*, 259 Md. App. at 380–81. Acting as Receiver of the HMO, Maryland's Insurance Commissioner sought to recover a security deposit that the HMO had paid BCD along with other money BCD owed the HMO under their lease. *Id.* After an evidentiary hearing, the circuit court ruled in favor of the Insurance Commissioner, ordering BCD to repay the HMO's security deposit plus some additional moneys for furniture the HMO had left on the premises. *Id.* at 381, 386. On appeal, BCD claimed that the circuit court "did not display the requisite impartiality and open-mindedness in conducting the hearing and in its Decision." *Id.* at 401. BCD added that the circuit court was hostile toward it and repeatedly demonstrated favoritism toward his opponents' counsel. *Id.*

15

alike. Bald allegations and adverse rulings are not sufficient to overcome this presumption of impartiality. *Reed v. Baltimore Life Ins. Co.*, 127 Md. App. 536, 556 (1999).

Nevertheless, we have long recognized that the impact of judicial bias is not limited to explicit or overt expressions of bias. Indeed, litigants may be affected by a judge's inadvertent conduct, such as facial expressions or gestures. As we explained in *Braxton*, "even unintended manifestations of bias have the same potential for improperly influencing a jury as verbal expressions of incredibility or disbelief directed at either party." *Braxton*, 91 Md. App. at 405 n.6; *see also Vandegrift v. State*, 237 Md. 305, 310 (1965). Where a trial judge steps "beyond the line of impartiality over which a judge must not step[,]" we have presumed that the trial judge's partiality influenced the jury and ordered a new trial. *Vandegrift*, 237 Md. at 310–11.

A litigant claiming bias on the part of the trial judge must "generally" move for relief "as soon as the basis for it becomes known and relevant." *Braxton*, 91 Md. App. at 406 (quoting *Surratt v. Prince George's Cnty.*, 320 Md. 439, 468–69 (1990)) (applying preservation standard applicable to recusal motions to claims that trial judge lacked impartiality during trial). Moreover, a litigant must identify the conduct to which they

---

After "careful review of the record," we found that BCD had not rebutted Maryland's strong presumption of judicial impartiality. *Id.* at 402. The circuit court attempted to accommodate the lack of legal experience asserted by BCD's counsel and to otherwise "control the proceedings to comport with the rules of evidence and professionalism." *Id.* Ultimately, we concluded that "the actions of which BCD complains don't reveal any bias or prejudice." *Id.* at 401. Accordingly, BCD had "failed to demonstrate that the court was biased in its treatment of BCD's claim in the delinquency proceedings." *Id.* at 402.

16

object and the relief they want during the trial, among other requirements. We reiterated

these requirements recently in *Baltimore Cotton Duck, LLC*:

> Preserving review of "the conduct and actions of a trial judge during the course of a proceeding in which it is alleged that such conduct is detrimental to a party's case" requires that "the party raises the issue during the trial," such that the record reflects the following four requirements:
>
> > (1) facts are set forth in reasonable detail sufficient to show the purported bias of the trial judge; (2) the facts in support of the claim must be made in the presence of opposing counsel and the judge who is the subject of the charges; (3) counsel must not be ambivalent in setting forth his or her position regarding the charges; and (4) the relief sought must be stated with particularity and clarity.
>
> *Braxton v. Faber*, 91 Md. App. 391, 408–09, 604 A.2d 543 (1992). Indeed, "it is incumbent upon counsel to state with clarity the specific objection to the conduct of the proceedings and make known the relief sought." *Id.* at 407, 604 A.2d 543.

*Baltimore Cotton Duck, LLC*, 259 Md. App. at 401. This preservation requirement

ensures[11] that allegations of judicial bias and partiality are not weaponized to avoid

unfavorable rulings or otherwise disrupt trial. *Surratt*, 320 Md. at 468–69; *Braxton*, 91

Md. App. at 406.[12]

---

[11] Preservation is particularly important in regard to claims of implicit bias, a variant of bias that resides in our unconscious, not our conscious brains. *Belton v. State*, 483 Md. 523, 549, n.14 (2023) ("The term 'implicit bias' denotes that 'behavior is largely influenced by unconscious associations and judgments that our conscious brain is not capable of processing." (cleaned up)). If a trial judge is not aware of how their implicit bias is impacting their discretionary evidentiary rulings, our preservation requirements afford litigants a chance to bring the matter to the trial judge's attention so that they may address it promptly.

[12] Where counsel's overt tactic is to inject "[i]mproper and irrelevant race-based evidence and arguments" into a trial, a timely trial objection is not a predicate for

A claim of judicial bias is not preserved when counsel equivocates on its charge of bias or in seeking relief for the alleged bias. *Braxton*, 91 Md. App. at 409. *Braxton* was an automobile negligence case in which Ms. Braxton alleged that the trial judge was racially biased against her and her counsel. *Id.* at 394–95. During Ms. Braxton's case-in-chief, her trial counsel detailed observations of the trial judge, including that he had "rushed [plaintiff and her counsel] along, rolled [his] eyes, yelled at [plaintiff and her counsel], complained, moaned and groaned, but only when the plaintiff is speaking or only when the plaintiff's attorneys are speaking." *Id.* at 399. Ms. Braxton's trial counsel also observed "that [defense counsel] is not being rushed along" and "that [defense counsel] is being prompted to make objections." *Id.* Later, after the jury had left the courtroom, the judge prompted Ms. Braxton's counsel to submit proof for her claim of judicial bias. *Id.* at 400. During this discussion, Ms. Braxton's counsel maintained that she had not "even mention[ed] the word 'bias'" and "ultimately capitulated" that she was "not accusing [the judge] of any bias per se." *Id.* at 401–02, 407. During this discussion, the trial judge questioned counsel on the purpose of raising this issue and what remedy would be sought, and counsel confirmed they were "just trying to make a record," and "not asking for a mistrial[.]" *Id.* at 403.

---

appellate review. *Tierco Md., Inc. v. Williams*, 381 Md. 378, 409, 416–17 (2004). Nonetheless, when race "*covertly* may affect the outcome of [a] trial[,]" our Supreme Court has recognized that in the absence of a timely objection, there is "little [an] appellate court[] can do to rectify directly such inchoate improprieties because the appellate record will be devoid of the mention of race and, accordingly, [there will be] no ability to link race as an improper causative influence on the verdict." *Id.* at 409, n.26 (emphasis added).

We held that Ms. Braxton's bias claim was not preserved because she did not set out her position without ambivalence or state, with particularity and clarity, the relief that she sought. *Id.* at 409. We concluded that counsel's "attempt to raise the question of judicial bias fail[ed] principally to put the trial judge on notice as to the relief sought and further obfuscate[d] the charges by recanting them." *Id.* at 409. In determining whether appellant had preserved her record adequately, we looked to *Surratt*, a recusal case, even though there was no recusal motion in *Braxton*. *Id.* at 406–07. In not making a motion for recusal or mistrial, or some other remedy, counsel "failed to make known what the trial judge should have done to ensure a fair trial." *Id.* at 409.

Claims that the trial judge's expressions "demonstrated disfavor," or that the trial judge prevented one party's probing into a certain area but allowed it of opposing counsel are not preserved if (1) the record does not disclose what those expressions or limitations were and (2) the harmed party makes no claim of partiality during the trial. *Reed*, 127 Md. App. at 554–55. In *Reed*, Mr. Reed appealed after being unsuccessful in a dispute with his former employer and another employee. *Id.* at 541. Mr. Reed argued that the trial judge was biased against him and his lawyer and should not have denied his recusal motion. *Id.* at 549–50. Mr. Reed claimed that the trial "judge's expressions plainly demonstrated her disfavor of [Mr. Reed's] counsel to the jury" and "the judge prevented counsel from probing areas into which [opposing] counsel was allowed to inquire." *Id.* at 554–55. To support these claims, Mr. Reed referred to his motion for recusal. *Id.* at 555. These references were insufficient. *Id.* Reiterating the four elements set forth in *Braxton,* we found Mr. Reed's "bald allegations of bias" lacking. *Id.* at 554–55.

> First is the assertion that the judge's expressions plainly demonstrated her disfavor of appellant's counsel to the jury . . . . In the instant case, however, we are unable to discern from the record the alleged expressions made by the trial judge. Appellant merely refers to his motion for recusal as evidence of the judge's improper body language. In the absence of specific references or proof offered on the record before the court and appellees' counsel, such bald allegations of bias are insufficient to support review.
>
> Furthermore, the record is insufficient to establish that the judge prevented counsel from probing areas into which appellees' counsel was allowed to inquire. Again, appellant's counsel presents this allegation without citation to the record where this contention was raised or proof that the partiality was displayed. Counsel refers us to his motion for recusal, which merely sets forth the allegation of prejudice without identifying facts demonstrating the trial judge's refusal to allow equal inquiries from both parties. Absent specific facts from the record, this contention is not sufficient for review.

*Id.* Because Mr. Reed's allegations did not fulfill the first preservation requirement, "(1) facts are set forth in reasonable detail sufficient to show the purported bias of the trial judge[,]" we could not and did not review them for impartiality. *Id.*

A claim of judicial bias is preserved when the record contains sufficiently detailed facts demonstrating alleged bias and counsel plainly calls out the bias and requests a remedy for it. *See Vandegrift*, 237 Md. at 310–11. In *Vandegrift*, the trial judge "asked many questions of [a defense] witness which taken as a whole or even individually amounted to a manifestation of his disbelief of the witness[.]" *Id.* at 310. After the questioning, the judge excused the jury, sought a bench warrant to charge the witness with perjury, ordered the witness off the stand, and set the witness's bail at $5,000. *Id.* at 310–11. Mr. Vandegrift's counsel moved for a mistrial, and the judge denied the motion. *Id.* at 311.

Mr. Vandegrift's claim of judicial partiality was properly preserved at the trial level. *Id.* Though this case predates *Braxton*, the elements for preservation were still met. The facts provided, which include a transcription of the judge's questioning of the witness, were sufficient to show the purported bias, and Mr. Vandegrift's counsel timely moved for a mistrial, in the presence of opposing counsel and the judge. *Id.* at 310–11. In ordering a new trial, our Supreme Court explained, "[t]he questioning by the trial judge showing his disbelief of the witness' testimony was beyond the line of impartiality over which a judge must not step." *Id.* at 310.

When a litigant claims that a trial judge is biased or prejudiced, or lacks impartiality, and that claim is preserved, we use an objective standard to review such claims. Thus, we ask "whether a reasonable member of the public knowing all the circumstances would be led to the conclusion that the judge's impartiality might reasonably be questioned." *Reed*, 127 Md. App. at 554 (quoting *Surratt*, 320 Md. at 465). Faced with a claim that a trial judge was biased and lacked impartiality, our task on direct appeal is not to adjudicate judicial misconduct, however. *Baltimore Cotton Duck, LLC*, 259 Md. App. at 401–02. Instead, "when reviewing a trial judge's alleged bias, and assuming the sufficiency of the record, our inquiry is limited to what impact, if any, the trial judge's alleged conduct had on the appellant's ability to obtain a fair trial." *Id.* at 401 (cleaned up).

When a litigant's claims of bias or partiality arise from a trial court's evidentiary rulings or the manner in which they have conducted the trial, we generally review those

matters for their legal correctness (or abuse of discretion) without trying to speculate about what might have motivated the judge to rule or act in a certain way.

> Unless there is palpable and demonstrable indicia of judicial bias, evidentiary calls and actions taken by the trial judge in the conduct of a trial are more appropriately reviewed in the context of whether the judge's rulings comport with applicable law, rather than by divining a motive speculatively attributed to the trial judge by counsel.

*Reed*, 127 Md. App. at 552 (citing cases). Mr. Reed also claimed the trial judge improperly threatened to report his counsel to the Attorney Grievance Commission, made an improper credibility determination against his counsel based on the judge's knowledge that a separate case had been dismissed because Mr. Reed's counsel had failed to appear, and personally testified about a document delivery from his former employer's counsel to his counsel in the judge's chambers. *Id.* at 552. We reviewed Mr. Reed's claims "to determine whether a reasonable member of the community reasonably would have questioned the judge's impartiality given the circumstances." *Id.* at 555.

Based on our review of the record, we concluded that Mr. Reed had failed to rebut the presumption of judicial impartiality in all three instances. *Id.* at 562. The trial judge's mention of the Attorney Grievance Commission was directed at both counsel and arose out of her concern that one of them had made a misrepresentation to the court. *Id.* at 557. The credibility determination was necessary in order to decide a discovery dispute and the information about the separate case was provided to the court by Mr. Reed's counsel. *Id.* at 559–60. The trial judge's recollection about what happened in chambers did not demonstrate bias or prejudice. *Id.* at 562. Of these claims, we said,

22

> Considering the voluminous testimony and intensive arguments regarding discovery disputes heard prior to, during, and after trial, it is apparent that a reasonable person would not reasonably believe that the trial judge acted partially. To the contrary, the judge allowed the parties to develop fully their positions before adjudicating the issues presented.

*Id*. at 562.

## I.    The Trial Court's Evidentiary Rulings Were Not an Abuse of Discretion

Returning to this case, we start by reviewing whether the trial court's evidentiary rulings "comport with applicable law[.]" *See Reed*, 127 Md. App. at 552 (further citation omitted). We conclude that the trial court was well within its discretion with the evidentiary rulings that HMH challenges. We review those rulings below.

### A.    *Precluding Mention or Evidence About Dr. Kennedy's Wife's Health*

HMH argues that it "was unfairly prejudicial and an abuse of the court's discretion" to decline to admit the reason why Dr. Kennedy could not travel to Maryland in person for the two-week trial. We disagree.

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5-403. "Probative value is outweighed by the danger of 'unfair' prejudice when the evidence produces such an emotional response that logic cannot overcome prejudice or sympathy needlessly injected into the case." *CSX Transp., Inc. v. Pitts*, 203 Md. App. 343, 373 (2012), *aff'd*, 430 Md. 431 (2013).

HMH proffered that it wanted to reveal the details of Dr. Kennedy's wife's health

23

condition in order to explain why Dr. Kennedy was testifying remotely:

> . . . that Dr. Kennedy, who was formerly Defendant in the case, but whose care remains at issue, even though he is not a named defendant, is not available to be here because of his wife's health conditions. Specifically, she, during the pandemic, was diagnosed with a brain tumor, significant one, had to have surgery. It was known in advance she would have disabilities. She is better now, but still not well enough. And he and his young children and his wife had to move to Florida. He is her caretaker. He will not be able to be here in person, and I wanted to in a much more succinct fashion, be able to reference[] that so the jury understood why he's not going to be present. I wanted to raise that in opening with any, you know, guidance from the Court as to how expansive or limited I should be about it. And also to raise [this] as direct testimony, and I will proffer to the Court that it would be something along those lines to explain he actually cannot be here and wishes he could throughout the trial. He would be here every day.

Appellees objected, arguing that evidence about Dr. Kennedy's wife's health condition "would promote unfair sympathy to him." The trial court agreed, ruling that HMH could tell the jury, and then elicit from Dr. Kennedy, that his remote participation was due to "personal family reasons":

> So the way I want to deal with this is that you're able to tell the jury that for personal family reasons he can't be here. Don't get into the brain tumor. Don't get into -- just for personal family reasons he can't be here. And that's it. Likewise, I don't expect the Plaintiffs to be making an issue of it, you know, in -- I wouldn't expect that you would. But much as we had the discussion in the previous hearings about opening the door, if the Plaintiffs were to go down the road of, you know, making some sort of allusion to the fact that he's not here or why isn't he here, then I may afford, certainly, the Defense an ability to respond accordingly.

When HMH did not adhere to this pretrial ruling, asking Dr. Kennedy about "personal family health issues" instead of "personal family reasons," the trial court sustained Appellees' objection.

| [HMH'S COUNSEL:] | You have testified at the beginning what your address is and I want to ask you -- |
|---|---|

|                          |                                                                                                                                                                                                                                                                                                          |
| ------------------------ | ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
|                          | specifically I understand that you are not able to be here. Does that relate to personal family health issues?                                                                                                                                                                                            |
| [PLAINTIFFS' COUNSEL]:    | Objection, Your Honor.                                                                                                                                                                                                                                                                                    |
| THE COURT:               | Sustained.                                                                                                                                                                                                                                                                                               |
| [HMH'S COUNSEL:]         | Are you able to be here in person?                                                                                                                                                                                                                                                                       |
| [PLAINTIFFS' COUNSEL]:    | Objection, Your Honor.                                                                                                                                                                                                                                                                                   |
| [DR. KENNEDY]:           | No.                                                                                                                                                                                                                                                                                                      |
| THE COURT:               | Sustained. We have established that the doctor lives in Florida currently and is not able to be here. He lives in Florida.                                                                                                                                                                                |
| [HMH'S COUNSEL]:         | May we approach, Your Honor?                                                                                                                                                                                                                                                                             |
| THE COURT:               | You may.                                                                                                                                                                                                                                                                                                 |

(WHEREUPON, COUNSEL APPROACHED THE BENCH AND THE FOLLOWING ENSUED.)

|                          |                                                                                                                                                                                                                                                                                                                                                                       |
| ------------------------ | ----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- |
| [HMH'S COUNSEL]:         | I apologize if I didn't understand the ruling correctly. I understood that I was able to give sort of a sanitized version of his inability to be here based on his personal family circumstances, which is what I did say in opening and I want to make sure the evidence supports what I said in opening. |
| THE COURT:               | Okay.                                                                                                                                                                                                                                                                                                                                                                  |
| [HMH'S COUNSEL]:         | Let me make sure. I mean, I can ask a very leading question.                                                                                                                                                                                                                                                                                                           |
| THE COURT:               | I don't know why we need to ask anything at this point. We have established that he is in Florida. He can't be here. I don't think we need to make a big issue of it.                                                                                                                                                                                                   |

Given that HMH proffered no reason why Dr. Kennedy's wife's health was relevant to HMH's defense of Appellees' medical malpractice claims, we cannot conclude that precluding admission of this evidence was beyond any center mark that one might envision. *See North*, 102 Md. App. at 14. We agree that admitting evidence about

25

Dr. Kennedy's wife's health could well have engendered sympathy for Dr. Kennedy, particularly as some of the other witnesses also testified remotely. While understandably of utmost importance to Dr. Kennedy, his wife's condition was not relevant to Appellees' claims against HMH. We see no abuse of discretion in the trial court's ruling.

### B. *Asking Dr. Kennedy About Nurse Askew's Note*

HMH next argues that it was an abuse of discretion to allow Appellees to ask Dr. Kennedy about Nurse Askew's note. The note was irrelevant and unfairly prejudicial, HMH contends, because it regarded how Mr. Jones had appeared at 4:00 am on September 21. HMH suggests that, by then, "even according to [Appellees'] theory, the window for intervention had closed." Again, we disagree.

Appellees offered three reasons why asking Dr. Kennedy about Nurse Askew's note was relevant: (1) that HMH "opened the door" to what happened on September 21 by eliciting detail during Dr. Kennedy's direct examination about him seeing Mr. Jones on September 21; (2) that, because part of Appellees' case was that Mr. Jones had a pulmonary embolism on September 20, his symptoms on September 21 were related to that; and (3) that Nurse Askew's note went to pain and suffering that Mr. Jones experienced on the morning of September 21.

| [PLAINTIFFS' COUNSEL:] | [Nurse Askew] documented in the records that Mr. Jones appeared to be anxious that morning. Do you remember seeing that? |
| --- | --- |
| [DR. KENNEDY:] | To be more complete, he was anxious throughout the hospital stay. |
| [PLAINTIFFS' COUNSEL:] | That morning it is specifically documented that he was anxious. Correct? |

26

| | |
|---|---|
| [DR. KENNEDY:] | It documents it. Give me one second. Can I refer to the note that you speak of? |
| [PLAINTIFFS' COUNSEL:] | Sure. It is page 199 of the medical record. |
| [HMH'S COUNSEL]: | I object, Your Honor. May I see the note? |
| THE COURT: | Is it the same objection? |
| [HMH'S COUNSEL]: | No. |
| THE COURT: | Come on up. |

(WHEREUPON, COUNSEL APPROACHED THE BENCH AND THE FOLLOWING ENSUED.)

| | |
|---|---|
| [HMH'S COUNSEL]: | So, one of the reasons that I moved for judgment at the close of the Plaintiffs['] case was because issues that had previously been in the case have been abandoned and we're now talking about a note that is explicitly not within the timeframe of any causation and is within the timeframe that the Plaintiff would like to criticize or at least to impugn, but his experts have not supported that. I was very careful about not going into detail on what happened on the 21st and now counsel wants to elicit information from that note and I think that is inappropriate and I think that shines a light on a point in time when counsel would like the jury to think that Dr. Kennedy was negligent and it is not supported by any expert testimony on the standard of care or causation. |
| [PLAINTIFFS' COUNSEL:] | I'm not going to any criticism here, Your Honor. **She, first of all, went into great detail what happened on the morning of the 21st, including that Dr. Kennedy saw the patient. So, that door has been opened.** Secondly, I'm just talking about what is in the note about **anxiety, because part of our case is that he had a pulmonary embolism on the day before and that these symptoms are related to that.** It is not criticizing anybody on the |

27

|  | 21st. This is a fact. This also **goes to pain and suffering that the witness had on the morning of the 21st because of our case that he experienced a PE on the 20th.** |
| [HMH'S COUNSEL]: | There has been no testimony from any expert that anxiety experienced on the morning of the 20th was precipitated by negligence. So, you can be a patient and experience bad things and it not be related to negligence. It is the Plaintiffs['] burden to connect them and they did not. |
| UNIDENTIFIED SPEAKER. | I join in the objection, Your Honor. |
| [HMH'S COUNSEL]: | I think having more discussion about the note on the 21st and the interaction mandates that I go in and have redirect on him on that and I think it opens wide a door that I have to then go through and have discussion. I don't think it is appropriate and it is not part of the case. |
| THE COURT: | I'll overrule the objection. |

(Emphasis added).

Thus, even if Nurse Askew's note documented events outside "the window of intervention," the note had other relevance. During his direct testimony, Dr. Kennedy had testified in detail about his care of Mr. Jones on September 21 and Mr. Jones's death that day. As such, we see no abuse of discretion in allowing Appellees to cross examine Dr. Kennedy about the events that surrounded his care of Mr. Jones that day.

### C. Asking Dr. Kennedy Whether He Had Asked Dr. Aurora if Dr. Aurora Thought They Would Be Sued

HMH next challenges the trial court's decision allowing Appellees to ask Dr. Kennedy whether he had asked Dr. Aurora if Dr. Aurora thought they would get sued

over Mr. Jones's death. HMH argues that the conversation between Dr. Kennedy and Dr. Aurora was "entirely irrelevant to any issue in the case, particularly when the cause of Mr. Jones'[s] death was unknown at the time of the alleged conversation." HMH further characterizes the conversation as unfairly prejudicial, as the jury could improperly perceive the discussion as evidence of mens rea. Again, we disagree.

"A witness generally may be cross-examined on any matter relevant to the issues, and the witness's credibility is always relevant." *Hill v. Wilson*, 134 Md. App. 472, 480 (2000) (holding, in a medical malpractice action, that defendant-physician's statements in writings and lectures on risk management were relevant to impeach the physician's credibility). A trial court may properly allow any question with a reasonable tendency "to explain, contradict, or discredit any testimony given by the witness in chief, or which tends to test his accuracy, memory, veracity, character or credibility." *Id.* (quoting *DeLilly v. State*, 11 Md. App. 676, 681 (1971)). The trial court maintains sound discretion over such an interrogation's scope and range. *Hill*, 134 Md. App. at 480.

Dr. Kennedy's testimony went to his credibility as a witness, including his memory of the relevant time period, rendering it properly admissible within the trial court's discretion.

| [PLAINTIFFS' COUNSEL:] | Following Mr. Jones's death, do you recall asking Dr. Aurora if he thought that the two of you were going to be sued about this case? |
|---|---|
| [HMH'S COUNSEL]: | Objection, Your Honor. |
| THE COURT: | Overruled. |
| [DR. KENNEDY:] | No. |

29

| | |
|---|---|
| [PLAINTIFFS' COUNSEL:] | Do you remember reading in Dr. Aurora's deposition that he testified that the two of you had that discussion? |
| [HMH'S COUNSEL]: | The same objection. |
| THE COURT: | Overruled. |
| [DR. KENNEDY:] | I don't share that recollection. I reflect just talking about what could have happened to this patient. But that wasn't my focus about litigation, no. |
| [PLAINTIFFS' COUNSEL:] | My question is, doctor, do you remember reading in Dr. Aurora's deposition that he testified that you had asked him if he thought that you were going to be sued in this case? |
| UNIDENTIFIED SPEAKER: | Objection, Your Honor. Asked and answered. |
| [HMH'S COUNSEL]: | Objection. |
| THE COURT: | Overruled. |
| [DR. KENNEDY:] | I don't share that recollection. |
| [PLAINTIFFS' COUNSEL:] | I didn't ask you if you shared the recollection. I'm asking you if you read that in Dr. Aurora's deposition? |
| [DR. KENNEDY:] | I don't remember reading that. |
| [PLAINTIFFS' COUNSEL:] | . . . Do you have a recollection of having a conversation with Dr. Aurora after Mr. Jones died as to whether his death could have been due to a pulmonary embolism or a massive heart attack? |
| UNIDENTIFIED SPEAKER: | Objection, Your Honor. |
| THE COURT: | Overruled. |
| [DR. KENNEDY:] | No, I don't share that memory. I did talk to Dr. Aurora about what could have happened and we were going to try to get answers in terms of getting the autopsy. |

The trial court had broad discretion to balance any risk of unfair prejudice from

30

such questioning against the probative value of Dr. Kennedy's testimony, and, under Maryland Rule 5-403, the trial court was only obligated to exclude the testimony if its probative value was "substantially outweighed" by the risk of unfair prejudice. We see no basis to disturb the trial court's weighing of those risks here.

## II. During Trial, HMH Did Not Preserve Its Judicial Bias Claim

To the extent that HMH claims that these evidentiary rulings and other conduct of the trial court were the product of racial bias on the part of the trial court, we hold that that claim is not preserved. HMH did not raise that claim during the trial with the specificity that *Baltimore Cotton Duck, LLC* requires.[13] During the trial, HMH either did not object to the rulings and conduct or objected on grounds other than judicial bias.[14]

### A. Permitting Dr. Aurora to Offer More Background Information than Dr. Kennedy

HMH contends that when Dr. Aurora offered background information about himself, particularly about his decision to become a doctor, Dr. Aurora was permitted to

---

[13] HMH does not address the preservation requirements of *Braxton* (or *Baltimore Cotton Duck, LLC*, which was issued between the filing of HMH's initial brief and Appellees' brief). HMH instead depends on *Belton v. State*, 483 Md. 523 (2023), wherein our Supreme Court addressed claims of judicial bias in an appellate opinion, not in rulings of a trial judge. Even in *Belton v. State*, though, Mr. Belton's bias claim was preserved because he filed a post-opinion motion before the court he claimed was biased (this Court). *Belton*, 483 Md. at 540. By contrast, HMH's bias claim was not preserved before the court it alleged was biased (the circuit court).

[14] We have mined the transcripts provided for mentions of bias, partiality, or race and racism. We have found nothing material to this issue. The only mentions of bias come during HMH's opening and closing statements, when its counsel discusses "hindsight bias," a type of bias not charged to the judge and irrelevant to the merits of this appeal. The only mentions of race again come from HMH itself, in counsel's opening statements on how Dr. Kennedy saw Mr. Jones as "a fellow Black man[.]"

do so. But, when HMH wanted to elicit testimony about Dr. Kennedy's wife's medical conditions as the reason for Dr. Kennedy's testifying remotely, the trial court precluded HMH from doing so. HMH claims judicial bias infected these rulings. HMH's claim is not preserved.

By the time Dr. Aurora was permitted to testify about why he became a doctor (the testimony that HMH claims is comparable), HMH knew "in reasonable detail" the facts it claimed showed the trial court's purported bias. *See Baltimore Cotton Duck, LLC*, 259 Md. App. at 401 (quoting *Braxton*, 91 Md. App. at 408–09). In other words, HMH then knew that Dr. Aurora had been allowed to give broader testimony about his personal circumstances than Dr. Kennedy had been.

Nonetheless, when Dr. Aurora was asked why he became a doctor, and Dr. Aurora answered, HMH did not object or move to strike his testimony. In other words, HMH did not raise the issue of bias "as soon as the basis for it bec[ame] known and relevant." *See Surratt*, 320 Md. at 469.

| | |
|---|---|
| [DR. AURORA'S COUNSEL:] | Before I get into your background, can you tell the ladies and gentlemen of the jury why you became a doctor? |
| [DR. AURORA:] | Sure. I unfortunately had both of my parents pass away early in my life. My mother died of a heart attack when I was 16. |
| [PLAINTIFFS' COUNSEL]: | Your Honor, I object. |
| THE COURT: | Overruled. |
| [DR. AURORA:] | My father when I was 18. After my father passed, I decided that I wanted to go into medicine. I switched from social science into medicine because I felt I wanted to |

see if I could prevent anyone else from having to go through that.

[DR. AURORA'S COUNSEL:]     Very good. Where were you born, sir?

### B.      *Cross-Examination Regarding Nurse Askew's Note*

HMH next points to the trial court's ruling regarding Nurse Askew's note as another example of bias and disparate treatment because, having allowed Appellees to question Dr. Kennedy about Nurse Askew's note, the trial court later declined to allow Dr. Aurora to be questioned about it. Once more, this claim is not preserved.

By the time Appellees tried to ask Dr. Aurora about Nurse Askew's note, HMH knew that Dr. Kennedy was not allowed to explain his wife's health condition while Dr. Aurora had explained why he went into medicine. Additionally, HMH knew that Appellees had been permitted to ask Dr. Kennedy about Nurse Askew's note.

Nonetheless, when the trial court ruled that Dr. Aurora could not be questioned about Nurse Askew's note, HMH did not remind the trial court that Dr. Kennedy had been questioned about it or charge the trial court with bias for having ruled differently or ask that Dr. Kennedy's answer be stricken. Instead, HMH objected because the answer was "backdoor testimony" as to Nurse Askew's standard of care.

[PLAINTIFFS' COUNSEL:]      But you were contacted by one of the nurses, Heather Askew?

[DR. AURORA'S COUNSEL]:     Objection, Your Honor. Can we approach?

THE COURT:                 Come on up.

. . .

[HMH'S COUNSEL]:           . . . I'm joining this because this is back door testimony to the standard of care against Ms. Askew who is the subject of

33

|                 |                                                    |
|-----------------|----------------------------------------------------|
|                 | the testimony that is being elicited. Of course, there was no allegation from any experts. |

. . .

|            |                                    |
|------------|------------------------------------|
| THE COURT: | I'm going to sustain the objection. |

### C.     *Cross-Examination Regarding the Conversation with Dr. Aurora*

HMH next contends that allowing Appellees to cross examine Dr. Kennedy about whether he had asked Dr. Aurora if Dr. Aurora thought they would be sued was the product of bias because the trial court did not allow similar questioning of Dr. Aurora. HMH here contends that "[t]he court shrugged off the fact that Dr. Kennedy was forced to answer the exact same inappropriate questions, saying that because 'Dr. Kennedy had already testified[,]' that issue is behind us." Again, this claim is not preserved.

By the time Appellees tried to ask Dr. Aurora about whether Dr. Kennedy had asked Dr. Aurora about being sued, HMH knew (1) that Dr. Kennedy had been prevented from testifying about his wife's condition and its impact on his trial attendance, while Dr. Aurora was allowed to testify about why he became a doctor; (2) that Dr. Kennedy was asked about Nurse Askew's note while Dr. Aurora had not been; and (3) that Dr. Kennedy was asked (and answered) questions about his conversation with Dr. Aurora. In other words, HMH knew "in reasonable detail" the facts it claimed showed the trial court's purported bias. *See Baltimore Cotton Duck, LLC*, 259 Md. App. at 401 (quoting *Braxton*, 91 Md. App. at 408–09).

Nonetheless, HMH did not set forth these facts to show the trial court's purported bias or seek relief "with particularity and clarity." *Baltimore Cotton Duck, LLC*, 259 Md.

App. at 401 (quoting *Braxton*, 91 Md. App. at 408–09). Instead, HMH raised an

unspecified objection:

| | |
|---|---|
| [PLAINTIFFS' COUNSEL]: | To avoid having another trip up here, I do intend to ask the doctor about his conversations with Dr. Kennedy after the death. |
| [DR. AURORA'S COUNSEL]: | I would object strenuously. |
| [HMH'S COUNSEL]: | I also object. |
| [DR. AURORA'S COUNSEL]: | This is the problem. This is the difficulty that the Court has is we hear this testimony, questions and answer, that was objected to and overruled. The particular testimony that Dr. Aurora spoke with Dr. Kennedy after the event and said words to the effect of "do you think we're going to get sued." First of all, that is irrelevant. The events have already occurred and that patient has died.<br><br>Now, here is counsel's problem. Dr. Kennedy doesn't recall the event and I'm left with the negative, which is, okay, so they had a discussion about getting sued which almost conveys to the jury a mens rea when in fact I have no ability to put Dr. Kennedy on a conversation that he doesn't remember and what relevance does that have? . . . |
| THE COURT: | Well, I agree with the defense preemptively that asking those questions that you have raised would be inappropriate. So, I'm not going to allow you to go into that. I understand your concern. |
| [DR. AURORA'S COUNSEL]: | Thank you. |
| THE COURT: | The issue with regard to -- Dr. Kennedy has already testified. So, that issue is already beyond us. |

35

### D. *Other (Extrajudicial) Instances of Alleged Bias*

HMH next contends that the trial court treated Dr. Kennedy and Dr. Aurora differently in comparable situations based on bias against Dr. Kennedy. In its brief, HMH argues:

> There are countless other examples of disparate treatment not tied to erroneous evidentiary rulings. The court sustained 14 of Plaintiffs' counsel's 25 objections during Dr. Kennedy's direct examination, and chastised Dr. Kennedy in front of the jury on three occasions, causing him to apologize and begin to question whether it was appropriate to provide complete answers.
>
> In contrast, Dr. Aurora's substantially similar answers garnered no objections. Dr. Aurora was given significant latitude not afforded to Dr. Kennedy and was permitted to stand before the jury and explain, using visual aids, the hernia surgery he performed on Mr. Jones even though there was no allegation that the surgery was negligently performed. The judge even left the bench and took an empty seat in the jury box to get a better view of Dr. Aurora's presentation.

Appellees respond that none of HMH's complaints indicate unfairness or judicial bias. According to Appellees, HMH has only itself to blame for the treatment of Dr. Kennedy and for any injection of race into the trial. As Appellees see it, the trial court properly exercised its discretion in making "garden-variety evidentiary rulings[,]" such as correctly sustaining objections when Dr. Kennedy's counsel continued to pose leading questions during Dr. Kennedy's direct examination. Appellees assert that any "admonishments" by the trial court were prompted directly and immediately by counsel's leading questions. Appellees also note that other witnesses were similarly instructed to provide responsive answers during testimony. Appellees conclude that any possible prejudice was cured by the trial court's jury instructions that neither race nor the judge's

36

conduct should influence the verdict.[15] Appellees argue that racial bias had no role at the

trial, because any injection of race was placed on the record by HMH, not the trial court.

> HMH's counsel told the jury in opening statement that Dr. Kennedy "saw Mr. Jones [as] a fellow Black man." It was an apparent attempt to establish some emotional connection between Mr. Jones and Dr. Kennedy that had nothing to do with whether Dr. Kennedy complied with the standard of care in treating Mr. Jones. Ironically, HMH's counsel's appeal to race in the opening statement highlights its ill-conceived appeal to race in this Court: Although Dr. Kennedy is Black, Mr. Jones, his wife, his mother, and his daughter are also Black. The same all-white jury that found that Dr. Kennedy, a Black physician, committed medical negligence in his care and treatment of Mr. Jones also found in favor of Mr. Jones'[s] Black family, awarding Appellees more than $1.2 million in damages for the injuries they suffered as a result of his preventable death. This obvious fact belies HMH's claim that implicit racial bias played any role in this case.

(Citation omitted). Appellees view HMH's appeal, and its arguments herein, as yet

---

[15] The trial court instructed the jury as follows on these topics:

> During the course of the trial, it has been my duty to rule on a number of questions of law, such as objections to the admissibility of evidenced [sic], the form of questions, and other legal points. You should not draw any conclusions from these rulings either as to the merits of the case or as to my views regarding any witness, party or the case itself.
> It is the duty of a lawyer to make objections that the lawyer believes are proper. You should not be influenced by the fact that these objections were made, no matter how the Court may have ruled on them.
> . . .
> You must consider and decide this case fairly and impartially. All persons, including corporations, stand equal before the law and are entitled to the same treatment under the law. You should not be prejudiced for or against a person because of that person's race, color, gender, religion, political or social views, wealth, or poverty. You should not even consider such matters. The same is true as to sympathy for any party.
> [Yo]u should not conclude from any conduct or words of mine that I favor one party or another, or that I believe or disbelieve the testimony of any witness. You, not I, are the sole judges of the believability of witnesses and the weight of the evidence. You must not be influenced in any way by my conduct during the course of the trial.

another attempt "to gain some perceived advantage by appealing to race in this case."

HMH's claim, as with the evidentiary rulings, is not preserved. At no time during or immediately after Dr. Aurora's direct testimony—the time at which counsel would be fairly apprised of the disparate treatment that it now claims Dr. Kennedy had suffered—did HMH set forth facts in reasonable detail to show the bias that it alleged, or otherwise meet *Baltimore Cotton Duck, LLC*'s preservation requirements.

As to the trial judge's moving to the jury box during Dr. Aurora's testimony, HMH raised no objection during or after Dr. Aurora's testimony.

| [DR. AURORA'S COUNSEL:] | Would the Exhibits 7, 8, 9 and 10 help you to describe the operative intervention that you undertook with Mr. Jones? |
|---|---|
| [DR. AURORA:] | Yes. |
| [DR. AURORA'S COUNSEL]: | I would ask for permission to step down. If you could step down so the jury can look at this. |
| THE COURT: | See if counsel need to reposition themselves as I will.[16] |

As to the trial court's alleged admonishments to Dr. Kennedy during his testimony, HMH likewise did not preserve its claim. By the time it became apparent that Appellees' counsel were lodging fewer objections during Dr. Aurora's testimony, Dr. Kennedy had already been admonished and HMH knew of the above rulings that it here

---

[16] Had HMH objected to the trial judge's moving to the jury box with the timeliness and specificity that *Baltimore Cotton Duck, LLC* requires, the trial judge could have heard the parties on the matter, and, if appropriate, explored other solutions. In this regard, the preservation requirements are as much about avoiding possible problems as documenting them.

challenges. Nonetheless, HMH did not bring up these issues until the close of evidence.

### III.    At The Close of Evidence, HMH Did Not Preserve Its Judicial Bias Claim[17]

Nor was HMH's bias claim preserved when, at the close of evidence, HMH asked

the trial court to permit it to recall Dr. Kennedy or for a stipulation about why he had

participated in the trial remotely. Although HMH then outlined some of the ways in

which it contended Dr. Kennedy had been treated differently from Dr. Aurora, HMH did

not ascribe these differences to racial bias as is required to preserve such a claim. *See*

*Baltimore Cotton Duck, LLC*, 259 Md. App. at 401 (quoting *Braxton*, 91 Md. App. at

408–09) (requiring a litigant that claims bias to set forth its position without

ambivalence). In fact, as to the number of interruptions in Dr. Kennedy's testimony,

HMH ascribed the problem to Appellees' counsel, not to what it now claims was the trial

court's bias. Indeed, the first time that HMH charged the trial court with treating Dr.

Kennedy differently *because of racial bias* was in its new trial motion, i.e., after trial and

after HMH had suffered an unfavorable verdict.[18]

---

[17] We assume, without deciding, that when HMH requested to recall Dr. Kennedy or for a stipulation, it was "during trial." By that time, however, Dr. Aurora and HMH had renewed their motions for judgment. Although HMH had not yet rested before the jury, it had indicated to the trial court its intent to do so. Effectively, then, when HMH asked for relief, the evidence was concluded.

[18] HMH's Motion for New Trial and supporting Memorandum of Law were filed on March 6, 2023, roughly two weeks after the February 24, 2023 judgment against HMH. In its Memorandum of Law in Support of Motion for New Trial, HMH argued,

> Although this Defendant does not assert there was any improper motive on the part of the Court, the impact of materially different treatment of two similarly situated defendant physicians was even more unfairly prejudicial here because Dr. Kennedy, a Black physician, had to defend himself with a

HMH pointed out the difference in how much information Dr. Kennedy was able to provide about his personal circumstances relative to Dr. Aurora, but it did not ascribe this difference, without ambivalence, to the trial court's racial bias:

> I think the fact that Dr. Kennedy was not able to even address or say that there was a health circumstance that kept him from being here when he is in this case to be treated as a party according to the agreement that [Appellees' counsel] and I reached does create a substantial prejudice and it looks different. The juxtaposition is just not fair. It is not right.

Instead, HMH attributed the difference to unfairness, that it was "not right," and was a different "look."

As to Appellees' being able to question Dr. Kennedy, but not Dr. Aurora, about Nurse Askew's note and whether Dr. Kennedy had asked Dr. Aurora if Dr. Aurora thought they would be sued, again, HMH pointed out the difference but did not ascribe it to the trial court's racial bias.

> Additionally, during the course of Dr. Kennedy's testimony as compared with Dr. Aurora's, and again I agree with how Your Honor sustained the objections during Dr. Aurora's, the questions to Dr. Kennedy on communications with Nurse Askew on the morning of the 21st where Plaintiffs counsel was eliciting that there was a disagreement between Dr. Kennedy and Nurse Askew as to whether or not the patient had said to Dr. Kennedy I'm feeling short of breath is well outside of the time that they were any criticisms, highly prejudicial, not probative.
>
> I had thought that counsel was not going into that. I admit that I don't have it in writing. So, I don't mean to suggest that there was a written agreement, but that to me was surprising having come in and then have it excluded during Dr. Aurora's testimony as well as the questions to Dr. Kennedy about Dr. Aurora's recollection of their conversation about whether or not they would get sued, which doesn't go to any issue in the case, is highly prejudicial, was excluded as to Dr. Aurora who is the one who

---

white co-defendant in front of an all-white jury. In such circumstances, the risk of unfair, implicit bias, affecting juror deliberations is even more heightened.

40

remembered it and then it was asked of Dr. Kennedy who counsel knows has no recollection of ever saying that and it was simply to get the question out there in front of the jury.

Each of those pieces prevented Dr. Kennedy, in addition to the fact that his really significant personal circumstances prevented him from being here in person has really prejudiced our ability to present him as a witness.

Instead, HMH ascribed the difference to "surprise" and to improper (albeit not racially based) motives on the part of Appellees' counsel.

Regarding the relief HMH wanted, while HMH asked to recall Dr. Kennedy to explain his wife's condition, or for a stipulation about his remote appearance, HMH did not, with particularity or clarity, ask for any relief related to Dr. Kennedy's having been asked about Nurse Askew's note and whether he had asked Dr. Aurora about being sued. HMH's counsel stated,

> . . . **The requested relief that I mentioned does not address the two issues that I think are very prejudicial and have already happened.** And those are with Dr. Kennedy being permitted to ask, despite counsel's knowing that he had no recollection of it, a question that was purely to inflame the jury and introduce the idea that Dr. Kennedy was worried only about being sued. Dr. Kennedy has no memory of that. There could have been no probative or relevant answer to that, I don't remember, but the question is why counsel asked it. **It was inappropriate and it is not cured by Dr. Kennedy coming back or by the Court making an instruction. I have to think about what I'm asking for for that.**

(Emphasis added).

## CONCLUSION

We take HMH's claim of judicial bias very seriously. Impartiality is what judges do. When a litigant claims that a judge has failed to act with impartiality, particularly in their discretionary evidentiary rulings, our preservation requirements give the litigants and the trial court a chance, as the trial occurs, to examine the claim and the proceedings,

41

to explain, to reconsider, and to move for (and grant or deny) substantial relief. For us, our preservation requirements enable fair and meaningful appellate review of what the trial court did (or did not do) in response to the charge of bias. But as important as these preservation requirements are, HMH did not follow them here.

The trial court here is presumed to have acted impartially. Even if HMH's bias claim is preserved, we see nothing on this record that rebuts this presumption. In the evidentiary rulings and conduct that HMH here challenges, we see no abuse of discretion. Moreover, to the extent that HMH now identifies differences in how the trial court ruled vis-à-vis Dr. Kennedy and Dr. Aurora, the presumption of impartiality means that we presume that those differences resulted from something other than bias. Some of the issues HMH raises here resulted from Dr. Kennedy's having testified before Dr. Aurora and Appellees' having lodged more objections during Dr. Kennedy's testimony than during Dr. Aurora's. HMH does not challenge the substance of the trial court's rulings on these objections, only that there were more of them. Surely, the trial court cannot have been expected to somehow even the objections tally simply for the sake of evenness.

Ultimately, we cannot conclude here that "a reasonable member of the public knowing all the circumstances would be led to the conclusion that the judge's impartiality might reasonably be questioned." *Reed*, 127 Md. App. at 554 (quoting *Surratt*, 320 Md. at 465). HMH has not shown otherwise.[19] Accordingly, we see no abuse of discretion in

---

[19] This result means that we need not address HMH's last argument in which it urges us to adopt Washington's presumption-of-prejudice approach in determining whether a litigant aggrieved by a trial judge's bias is entitled to a new trial. *See*

the trial court's denial of HMH's new trial motion. We affirm.

**JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

*Henderson v. Thompson*, 518 P.3d 1011 (Wash. 2022). Maryland has used such an approach on at least one occasion in a criminal case. *See Vandegrift*, 237 Md. at 311 ("The judge asked many questions of the witness which taken as a whole or even individually amounted to a manifestation of his disbelief of the witness, which we must presume influenced the jury, whose function it was as the triers of the facts to determine the credibility of the witnesses."). Because HMH did not show that the trial court acted with bias or partiality, we do not reach the question of whether to presume that HMH was denied a fair trial.